UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

LORTERDAN PROPERTIES AT RAMAPO I, L.L.C.,

                        Plaintiff,

      -against-

WATCHTOWER BIBLE AND TRACT SOCIETY OF
NEW YORK, INC.,
                     Defendant.
------------------------------------------------------------------X

Case No. 11-cv-03656 (CS) (LMS)

ECF Case

## AFFIDAVIT OF ROBERT D. JACKSON
## IN SUPPORT OF PLAINTIFF'S MOTION FOR
## SUMMARY JUDGMENT PURSUANT TO FED.R.CIV.P. RULE 56

STATE OF NEW JERSEY      )
                              )ss.:
COUNTY OF ESSEX          )

ROBERT D. JACKSON, being duly sworn, deposes and says:

1.      I am the managing member of Plaintiff Lorterdan Properties At Ramapo I, L.L.C.

("Lorterdan") and this Affidavit, based on personal knowledge and, *inter alia*, a review of public

records on file with the Town of Ramapo (the "Town"), is respectfully submitted in support of

Lorterdan's Motion for Summary Judgment (the "Motion").

### PRELIMINARY STATEMENT

2.      As demonstrated below from the undisputed facts, documentary evidence and

caselaw cited in Lorterdan's Memorandum of Law, no genuine issue of material fact exists as to

the breach by Defendant Watchtower Bible And Tract Society Of New York, Inc.

("Watchtower") of its obligation to pay Lorterdan the sum of $9.5 Million ("Balance Due" or

"$9.5 Million") under the multiple agreements between the parties regarding the sale by Lorterdan to Watchtower of the Subject Property[1] on February 27, 2009.

### THE SALE OF THE SUBJECT PROPERTY

3.     Pursuant to a Purchase and Sale Agreement dated January 23, 2009 (the "PSA," Exhibit[2] 1), Watchtower elected to close title on February 27, 2009 (the "Closing"). The PSA expressly provided that specifically enumerated obligations and rights of the parties would survive the Closing.

4.     Lorterdan anticipated total consideration of $21 Million from the sale, with $11.5 Million paid at Closing. Under a Consulting Agreement (Ex. 2) and Repurchase Agreement (Ex. 3) (collectively, the "Agreements") signed at Closing,[3] the Balance Due was deferred and structured as consideration to be paid upon the *first* to occur of any of certain designated and alternative events or milestones within two (2) years from the Closing (the "Two Year Period"). Ex. 2.

5.     Included among those separate, distinct and independent milestones were, *inter alia*, the following:

        (a) Watchtower "determin[ing] that it [would] proceed" with development of the Subject Property for its stated non-profit use (the "Watchtower Development") (Ex. 2 at §4(a)); or

        (b) The Town's Rezoning of the Subject Property upon application therefor by Watchtower (Ex. 3 at §2.9); or

---

[1]     All defined terms not otherwise defined herein carry the same meaning as in Lorterdan's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1, dated September 6, 2011 ("Statement of Undisputed Material Facts").
[2]     The term "Exhibit" shall hereinafter be referred to as "Ex."
[3]     Watchtower was represented by counsel at Closing and throughout the negotiation of the PSA, Consulting Agreement, and Repurchase Agreement.

(c) A sale by Watchtower of the Subject Property (Ex. 2 at §5); or

(d) Watchtower's failure to duly and lawfully elect during the Two Year Period to sell the Subject Property back to Lorterdan pursuant to Section 2 of the Repurchase Agreement (Ex. 2 at §4(b)).

6.     Specifically, Section 4(a) of the Consulting Agreement required Watchtower to pay Lorterdan the Balance Due if, within the Two Year Period, Watchtower determined to proceed with the Watchtower Development described in the PSA, Consulting Agreement, and Repurchase Agreement. *See* Ex. 2 at §4(a). Upon determining to proceed, Watchtower was obligated to provide notice to Lorterdan, with payment of the Balance Due Lorterdan required within ten (10) days. Ex. 2 at §4.

7.     Conversely, upon determining not to proceed before the end of the Two Year Period (obviously *without* having previously determined to proceed and withholding of notice thereof to Lorterdan in bad faith), Watchtower had the right under the Agreements, on six (6) months notice, to sell the Subject Property back to Lorterdan for the same $11.5 Million previously paid at Closing. *See* Ex. 2 at §6 and Ex. 3 at §2.

8.     It is self-evident that Watchtower was not entitled to "determine to proceed," as it clearly did here, yet avoid payment of the Balance Due within ten (10) days by merely withholding the required notice.

9.     Upon determining to proceed, as Watchtower did at the outset of the Two Year Period,[4] Watchtower's obligation to pay Lorterdan the Balance Due *immediately* vested and Watchtower's ability to sell the Subject Property back to Lorterdan permanently lapsed.  This is the case because at that time Watchtower was obligated to so notify Lorterdan and pay the Balance Due within ten days.  Thereafter, Lorterdan had no remaining obligation to Watchtower and vice-versa.

10.    Under the Agreements, once Watchtower determined to proceed, as it did here, it was forever barred from subsequently notifying Lorterdan that it had determined ***not*** to proceed and attempting to sell the Subject Property back to Lorterdan.[5]  Ex. 2 at §4.

11.    Similarly, and in the alternative, upon the Town rezoning the Subject Property upon application by Watchtower, Watchtower could never thereafter determine not to proceed and evade payment of the Balance Due to Lorterdan.  This is the case because upon Town rezoning, Watchtower was obligated to pay forthwith the Balance Due Lorterdan and, similarly, all of the rights and obligations of the parties, one to the other, would terminate. Ex. 3 at §2.9.

12.    As discussed below in great detail, Watchtower unequivocally determined to proceed on February 27, 2009 upon Watchtower's filing "as provided by law" of Watchtower's First Tax Exemption Application duly verified by Watchtower as "true and correct and complete" wherein Watchtower swore, *inter alia*, that ***construction*** of the Watchtower

---

[4]    Watchtower's determination to proceed on this record presents no genuine question of material fact because, *inter alia*, Watchtower's First Tax Exemption Application filed by Watchtower with the Town "as provided by law" constituted, I am advised, Watchtower's verified and affirmative representation that it had "concrete and definite plans" to proceed with construction of the Watchtower Development buildings and improvements.  *See* Ex. 5 and Memorandum of Law at Point II.

[5]    *A fortiori*, once Watchtower actually proceeded as it also did herein, the purported exercise by Watchtower of allegedly remaining "rights" under Section 2 of the Repurchase Agreement was precluded.

Development buildings and improvements detailed in the Watchtower Architectural Site Plan would begin "as soon as" it received necessary Town approvals (Exs. 5 and 6).

13.     Watchtower's true, correct and complete First Tax Exemption Application is, respectfully, dispositive evidence of Watchtower's determination to proceed herein.   That determination thereby obligated Watchtower to immediately so notify Lorterdan and pay Lorterdan the Balance Due within ten (10) days of such notice, thereby forever precluding a sale of the Subject Property back to Lorterdan upon any basis.

14.     Nevertheless, on November 1, 2010 Watchtower attempted to deceive Lorterdan and issued a notice to Lorterdan (the "Notice of Sale") disingenuously claiming that (i) it had determined *not* to proceed with the Watchtower Development and (ii) it was selling the Subject Property back to Lorterdan for $11.5 Million on six months notice.  Ex. 4.[6]

15.     Watchtower's bad faith or deception is evidenced, *inter alia*, by the implicit if not explicit implication of the Notice of Sale; to wit: that Watchtower had not previously determined to proceed (or actually proceeded) but withheld the required notice thereof to Lorterdan.

16.     As discussed below and in Lorterdan's Memorandum of Law, I am advised that the Notice of Sale by Watchtower was precluded as a matter of law as a result, *inter alia*, of: (a) Watchtower's pre-Notice of Sale sworn declarations and conduct which clearly and unambiguously evidence Watchtower's determination to proceed, actual proceeding with the Watchtower Development *and* (b) Watchtower's duly certified statements in Watchtower's public record filings with the Town *after* the Notice of Sale in which Watchtower

---

[6]     Watchtower enclosed a copy of the Repurchase Agreement (annexed hereto as Ex. 3) with the Notice of Sale. In order to avoid duplication, that enclosure has been intentionally omitted from the Notice of Sale annexed hereto at Ex. 4.

unambiguously certified that the Subject Property had *not* "been offered for sale." *See* Memorandum of Law at Points I, II and III.

## THE PLAIN MEANING OF "DETERMINE TO PROCEED" AND WATCHTOWER'S BAD FAITH

17.     I am advised by counsel that all of the Agreements expressly provide that they are to be construed and enforced in accordance with the laws of the State of New York. Ex. 1 at §12.7, Ex. 2 at §9 and Ex. 3 at §2.12.

18.     I am further informed that the courts of the State of New York regularly refer to the dictionary to determine the plain and ordinary meaning of undefined words or terms in a contract so governed by New York law, *e.g.* the Agreements herein. *See* Memorandum of Law at Point I.

19.     As stated above, under Section 4(a) of the Consulting Agreement, in the event Watchtower "determined to proceed" within the Two Year Period, Watchtower was obligated to immediately so notify Lorterdan, remit payment of the Balance Due to Lorterdan within ten days thereof and was thereafter forever barred from selling the Subject Property back to Lorterdan. Ex. 2 at §4.

20.     The "plain and ordinary meaning" of "determine to proceed" establishes that no genuine dispute of material fact exists on *this* record with respect to Watchtower's unequivocal determination to proceed herein. *See* Memorandum of Law at Point I.

21.     As set forth in the Merriam-Webster On-Line Dictionary, the plain meaning of the word "***determine***" is "1. to come to a decision." *See* Memorandum of Law at Point I.

22.     Similarly, the word "***proceed***" is defined in the Merriam-Webster On-Line Dictionary as: "2b. to go on in an orderly regulated way . . . 3a. to begin and carry on an action,

process, or movement . . . 4. to move along a course : ADVANCE." *See* Memorandum of Law at Point I.

23.     The documentary evidence presented on this record and discussed below clearly establishes that Watchtower "came to a decision to begin and carry on" with the Watchtower Development on February 27, 2009 by its voluntary filing of Watchtower's duly verified First Tax Exemption Application where Watchtower voluntarily, truthfully, correctly, completely, plainly and unambiguously swore that it had ***decided*** to begin ***construction*** of the Watchtower Development buildings and improvements "as soon as" the requisite approvals could be obtained. Ex. 5.

24.     As such, Watchtower then and there became obligated to notify Lorterdan and simultaneously indebted to Lorterdan for the Balance Due within ten days thereof.  At that time, Watchtower was forever precluded from issuing the Notice of Sale.

25.     I am also advised that every contract entered into in the State of New York by law contains a covenant of good faith and fair dealing in the course of contract performance, a covenant which embodies the concept that neither party to a contract shall do anything having the effect of destroying or injuring the right of the other party to receive the fruits of the contract. *See* Memorandum of Law at Point V.

26.     By dishonestly and deviously withholding notice of its blatant determination to proceed, which determination is overwhelmingly established on the record herein (Exs. 5-21, 25 and 27), Watchtower outrageously sought to deprive Lorterdan of the "fruits" of the Agreements, *i.e.* payment of the Balance Due, even though same had clearly become due and owing within ten (10) days of Watchtower so determining to proceed as of February 27, 2009.

27.    The express and implied terms of the Agreements and covenant of good faith and fair dealing obviously barred Watchtower from determining to proceed, but feigning otherwise (or withholding the required notice) to deprive Lorterdan of the Balance Due and then later attempting to sell the Subject Property back to Lorterdan on the basis that no such determination had ever been made.

28.    Indeed, once Watchtower decided to begin and carry on the Watchtower Development, Lorterdan was to be promptly paid.  Watchtower retained *no* right to subsequently determine otherwise.  Simply stated, Watchtower was *not* granted the right to a "do-over" vis a vis its determination to proceed, the Subject Property and Lorterdan.

29.    Respectfully, the Agreements and law, I am informed, permit no such "flip-flop."[7] *See* Memorandum of Law at Points III and IV.

30.    On this record, Watchtower's issuance of the Notice of Sale was thus a clear breach of the covenant of good faith and fair dealing.  *See* Memorandum of Law at Point V.

31.    This is the case I am advised because Watchtower's material misrepresentation in the Notice of Sale that it had determined not to proceed was *false* and far too little, far too late (as Watchtower had already determined to proceed nearly two years earlier, had sworn to the same, and had actually proceeded with the Watchtower Development process).

32.    I further believe that Watchtower knew the Notice of Sale was false, and was issued deliberately either for the express purpose of inducing Lorterdan to rely thereupon and go

---

[7]    I am further advised by Lorterdan's counsel that no citation is needed for the elementary principle that Watchtower cannot rewrite the terms of the Agreements including, in particular, Section 4(a) of the Consulting Agreement triggering payment of the Balance Due upon Watchtower's determination to proceed.  Accordingly, Watchtower's obligation under Section 4(a) immediately vested ten (10) days from the making of such determination with the required notice to Lorterdan being a ministerial obligation imposed upon Watchtower by Section 4 of the Consulting Agreement.

forward with purchasing the Subject Property for $11.5 Million, or, far more likely, part and parcel of a plan from "day one" to acquire the very valuable Subject Property for essentially half price!

33.     Based upon the foregoing, and irrespective of Watchtower's inner motive or subjective thought process vis á vis its bad faith herein, which I am advised is irrelevant to a summary judgment motion, it is clear that no genuine dispute of material fact exists as to Watchtower's breach of its contractual obligation to pay the Balance Due to Lorterdan, together with New York statutory interest and prevailing party attorneys' fees.

## WATCHTOWER DETERMINED TO
## PROCEED LONG BEFORE THE NOTICE OF SALE

34.     Watchtower had no obligation under the Agreements to determine to proceed in the first place, or, to ever file for real property tax exemption,[8] or swear to the decisions already reached by Watchtower as of February 27, 2009. Exs. 1-3 and 6-9.

35.     Nonetheless, at the inception of the Two Year Period, with no obligation whatsoever, Watchtower honestly, truthfully, and voluntarily filed, as provided by law, with the Town Assessor of the Town of Ramapo (the "Tax Assessor") its first of three consecutive annual applications for real property tax exemption for the Subject Property,[9] dated February 27, 2009

---

[8]     The Subject Property was on the Town of Ramapo tax rolls at the time of Closing. For the tax year preceding Closing, Lorterdan had paid approximately $400,000 in real property taxes.
[9]     Because the Subject Property consisted of 293 separate parcels, multiple applications had to be filed for tax exemption. For all filings with the Town or its agencies or documents issued by the Town or its agencies with respect to the Subject Property referred to herein and annexed as exhibits, only one copy of each such application, filing, or document is annexed as an Exhibit in the interest of judicial economy.

("Watchtower's First Tax Exemption Application" at Ex. 5[10]), where Watchtower plainly, unambiguously, honestly, truthfully and completely verified, in sum and substance, that it had determined to proceed with the Watchtower Development, *i.e.* "came to a decision to begin and carry on" therewith.

36.     In filing Watchtower's First Tax Exemption Application and applying for RPTL Section 420-a(1) and (3)(a) tax exemption "as provided by law," I am advised that the law conditions entitlement to such tax exemption upon "concrete and definite plans" to proceed. *See* Memorandum of Law at Point II.  Obviously, this is why Watchtower attached the Watchtower Architectural Site Plan and affirmatively represented that construction would commence "as soon as" necessary approvals were obtained.

37.     Specifically, Watchtower's First Tax Exemption Application contained, *inter alia*, the following verified and affirmative representations of Watchtower's "determination to proceed" with the Watchtower Development:

> (a) Watchtower's confirmation that all necessary organizational authorizations and approvals for proceeding with the Watchtower Development had already been obtained by Watchtower as evidenced, per Watchtower, by its

---

[10]     In addition to Watchtower's First Tax Exemption Application, Watchtower also filed complementary forms entitled "NYS Board of Real Property Services Application for Real Property Tax Exemption For Nonprofit Organizations – Mandatory Class I – Organization Purpose (RP-420-a-Org (9/08) ("Watchtower's Organizational Forms"), dated February 27, 2009 and May 25, 2009, respectively, in which an applicant for real property tax exemption sets forth its organizational purpose qualifying it to apply for such an exemption.  I am informed that an applicant must establish its entitlement to exemption based upon its (i) organizational purpose and (ii) use of the real property.  Watchtower's  Organizational Forms are immaterial for purposes of the case at bar in that only Watchtower's First Tax Exemption Application contained the numerous representations that Watchtower had determined to proceed with the Watchtower Development.   Watchtower also filed the appropriate renewal forms setting forth its organizational purpose along (but not necessarily simultaneously) with its subsequent second and third applications for tax exemption, both of which reaffirmed the contents of Watchtower's First Tax Exemption Application including Watchtower's concrete and definite plans to use the Subject Property for the Watchtower Development as provided by law under RPTL Section 420-a(1) and (3).  Exs. 5, 25 and 27.

contemporaneous filing with the Town Planning Board of its Community Design Review Committee ("CDRC") Application for the Watchtower Development ("CDRC Application");

(b) Watchtower's detailed description of the buildings and improvements to be constructed at the Watchtower Development, consisting of, *inter alia*, "offices for religious activities," and "residences and support services for resident members of Jehovah's Witnesses' religious order,"[11] the names and sizes of the Watchtower Development buildings and improvements being as shown on Watchtower's detailed "Watchtower Development - Architectural Site Plan" (the "Watchtower Architectural Site Plan");

(c) Watchtower's sworn declaration of its dedication of the necessary financial resources from its own specifically identified internal assets and holdings to pay for its construction of the Watchtower Development buildings and improvements; and

(d) Watchtower's sworn, affirmative representation that **construction** of the Watchtower Development buildings and improvements so identified therein would begin "**as soon as** necessary Town and other approvals for the development [were] obtained."

Ex. 5 at §§14 (b), (c), (d), and (e) (emphasis supplied) (brackets added) and Ex. 6.

38.    Notably, the unambiguous declarations reflecting Watchtower's clear determination to proceed contained in Watchtower's First Tax Exemption Application were verified by an officer thereof as "true and correct and complete" and "made for real property tax exemption as **provided by law**." Ex. 5 at p. 3 (emphasis supplied) (VERIFICATION).

---

[11]    The Watchtower Development buildings and improvements whose location was depicted on the Subject Property in the Watchtower Architectural Site Plan also included but were not limited to: "Assembly Hall 2 flrs"; "Lobby/Office 3 flrs"; "Vehicle Services 2.5 flrs"; Numerous "Residences" of either 3 or 4 floors; "Kitchen/DR/Home Services 3 floors"; "Office Bldg 3 floors"; "Power House"; "Maintenance 3 floors"; Two Parking Garages comprising of 4 levels; and tennis courts, basketball courts, and picnic grounds. Ex. 6. The Watchtower Architectural Site Plan, annexed to and made a part of Watchtower's First Tax Exemption Application, identified precisely where on the Subject Property, *inter alia*, six (6) separate Stormwater Treatment Ponds would be created and located to serve the Watchtower Development and where a Pump House would also be created and located to serve the Watchtower Development. A copy of the Watchtower Architectural Site Plan is annexed separately as Ex. 6 rather than as a part of Watchtower's First Tax Exemption Application at Ex. 5.

39.     I am advised that a tax exemption application for unused vacant property, producing no revenue, like the Subject Property throughout and beyond the Two Year Period, filed as ***provided by law*** (*see* Verification, Ex. 5 at p.3), represents that the decision to proceed with ***construction*** of buildings and improvements has been reached pursuant to ***concrete and definite plans***. *See* Memorandum of Law at Point II. Hence, Watchtower's verified representation that construction would begin "as soon as" all necessary approvals were obtained was an unequivocal representation that Watchtower had so determined to proceed pursuant to concrete and definite plans, as the Agreements were ***not*** conditioned upon the contingency of receiving ***any*** specific approval, ***all*** necessary approvals or building permits.[12]   The foregoing plain and unambiguous documentary evidence demonstrates on the law that Lorterdan should have been paid the Balance Due within 10 days, *i.e.* by March 10, 2009. *See* Memorandum of Law at Points I and II.

40.     As developed below in sequence, so committed was Watchtower to the above-quoted effective determination to proceed that, upon denial by the Town of Watchtower's First Tax Exemption Application, Watchtower appealed to the Town Board of Assessment Review ("BAR").  Then, upon the BAR's denial of Watchtower's appeal, Watchtower filed an action against the Town Assessor, BAR and Town seeking to enforce its claimed entitlement to complete tax exemption under New York Real Property Tax Law ("RPTL") Section 420-a(1) and (3)(a), *i.e.* Watchtower's State Court Litigation.   *See* Exs. 16, 17, 30 and 31 and Memorandum of Law at Points I and II.

---

[12]     The rezoning approval set forth in Section 2.9 of the Repurchase Agreement was an alternative milestone or event which was separate, distinct and independent from several other alternative milestones or events, any one of which, per the Agreements, "triggered" Watchtower's payment obligation to Lorterdan of the Balance Due.

## WATCHTOWER DETERMINED TO PROCEED

41.     I am advised by counsel that, on this Motion record and pursuant to RPTL Section 420-a(1) and (3)(a), all three (3) of Watchtower's consecutive annual duly verified and/or certified tax exemption applications "made for real property tax exemption as provided by law" (Ex. 5) (alternatively, "Watchtower's First Tax Exemption Application," "Watchtower's Second Tax Exemption Application," and "Watchtower's Third Tax Exemption Application," *see* Exs. 5, 25 and 27) were always premised, as a matter of law, upon Watchtower's determination to begin construction which was not yet in progress at all throughout and beyond the Two Year Period on the Watchtower Development pursuant to *concrete and definite* plans.  *See* Memorandum of Law at Point II.

42.     This is the case as I understand the law because Watchtower's three (3) tax exemption applications aforementioned were *never* based upon construction already in progress or existing use of, or worship on, the Subject Property, but rather on Watchtower's post-construction use of the buildings and improvements to be constructed on the Subject Property, *e.g.* the Watchtower Development more particularly described in the Watchtower Architectural Site Plan filed with and made a part of Watchtower's *First* Tax Exemption Application.  *See* Ex. 5 at §14(b) and Ex. 6.

43.     Moreover, it is indisputable that Watchtower's Second Tax Exemption Application and Third Tax Exemption Application, respectively (Exs. 25 and 27), were both predicated upon renewal applications that reaffirmed the sworn declarations and representations made by Watchtower in Watchtower's First Tax Exemption Application.  [*See* Ex. 5 at p. 4

("[e]ach year following the year in which exemption is granted on the ***basis of this application***[13], renewal forms RP-420-a/b-Rnw-I and RP-420a/b-Rnw-II must be filed")] (emphasis supplied).

44.     Since there is no dispute here by Watchtower that the Subject Property was vacant and not in use because of the absence of suitable buildings or improvements (and the construction of such buildings or improvements was not in progress) at the time of each of Watchtower's three tax exemption applications, Watchtower well-knew[14] that any good faith and veracious application by Watchtower for real property tax exemption had to be and was in fact, as Watchtower expressly verified in its own words (and "as provided by law"), based upon ***concrete and definite plans*** for the construction of the Watchtower Development.   This is precisely why Watchtower swore in Watchtower's First Tax Exemption Application, an application verified by Watchtower as true, correct, complete and filed as provided by law, that construction of the Watchtower Development would begin "as soon as" all necessary approvals were obtained.   *See* Ex. 5 and Memorandum of Law at Point II.

45.     By swearing under oath (including in Watchtower's Verified Petition in Watchtower's State Court Litigation) and/or certifying on multiple occasions throughout the Two Year Period that, in sum and substance, it had ***concrete and definite plans*** to construct the Watchtower Development (*see* Exs. 5, 17, 25 and 27), Watchtower's determination to proceed, *i.e.* that it "came to a decision to begin and carry on" with the Watchtower Development, presents no question of fact.   *See* Memorandum of Law at Point I.

---

[13]     Watchtower's First Tax Exemption Application was granted by Order of the State Supreme Court in Watchtower's State Court Litigation and then by the Tax Assessor. *See* Exs. 23 and 24.

[14]     At all times relevant herein Watchtower was and is a sophisticated, mammoth not-for-profit organization formed in 1909 with innumerable real property holdings and an in-house legal department expert in all nuances of RPTL 420-a tax exemption standards, as evidenced by the seven (7) reported New York cases involving Watchtower and real property tax exemption. Exs. 9 and 17 at Exhibit A.

## THE MOTION RECORD

46.     The documentary evidence made a part of this Motion record, together with Lorterdan's Statement of Undisputed (and indisputable) Facts, itemize virtually all of Watchtower's express declarations, verified and certified filings, and unambiguous acts throughout the Two Year Period, which conclusively establish Watchtower's determination to proceed and are also irreconcilable with the Notice of Sale. *See* Memorandum of Law at Points I, II, III and IV.

47.     Although there is no genuine dispute of material fact that Watchtower had determined to proceed as of February 27, 2009 via Watchtower's First Tax Exemption Application and that Lorterdan should thus have been paid the Balance Due within ten days thereof, such other plain, unambiguous, and glaring documentary evidence of Watchtower's determination to proceed (and actual proceeding)[15] after the February 27, 2009 Closing as well as several voluntary steps taken by Watchtower in furtherance of the Watchtower Development even *prior* to Closing, include the following:

- In furtherance of its actual proceeding with the Watchtower Development process, Watchtower proceeded with filing of an Application to the CDRC in connection with its Rezoning Application (defined *infra*), relying upon that Application in Watchtower's First Tax Exemption Application as definitive proof of its Board's approval of its decision to proceed with the Watchtower Development (Ex. 7);

---

[15]     While the focus of this Motion is on Watchtower's clear determination to proceed, as that determination to proceed by Watchtower on February 27, 2009 is what triggered Watchtower's payment obligation under Section 4(a) of the Consulting Agreement, it is also abundantly clear from the documentary evidence presented herein that Watchtower did far more than "determine to proceed" but actually "proceeded" with the Watchtower Development process throughout the Two Year Period. *See* Exs. 5-21 and 25. To avoid undue repetition herein, however, the central focus throughout this Affidavit will be on how all of Watchtower's overt and unambiguous acts, declarations, and filings unambiguously evidence Watchtower's unequivocal "determination to proceed."

- In furtherance of its actual proceeding with the Watchtower Development process, Watchtower filed with the CDRC a "State Environmental Quality Review ("SEQRA") Short Environmental Assessment Form" (the "EAF") in connection with its Rezoning Application for the Watchtower Development identified therein as the "Watchtower Administrative Center" (Ex. 8);

- In furtherance of its actual proceeding with the Watchtower Development process, Watchtower prepared and filed with the Town for review and comment a comprehensive summary of its plans for the Watchtower Development on the Subject Property, developed in four (4) parts as follows: "Part A – Existing Conditions, Part B – Alternate Proposal, Part C – Table Comparing Existing Approval with Proposal, Part D – Similar Developments" ("Watchtower's Narrative") (Ex. 9);

- In furtherance of its actual proceeding with the Watchtower Development process, Watchtower's Narrative explained its plan to relocate 850± volunteers from its present facility in Brooklyn, New York to the Watchtower Development (Ex. 9 at p. 1);

- In furtherance of its actual proceeding with the Watchtower Development process, Watchtower's Narrative related that Watchtower's proposed use would have "no impact" on the Town of Ramapo's schools, would not generate commuter traffic, and would have a "smaller environmental footprint, and less of an impact on some services" (Ex. 9 at p.1);

- In furtherance of its actual proceeding with the Watchtower Development process, Watchtower filed with the Town the detailed and meticulous Watchtower Architectural Site Plan (Exs. 6 and 9);

- In furtherance of its actual proceeding with the Watchtower Development process, Watchtower filed with the Town as an attachment to Watchtower's Narrative an extraordinarily detailed "Electrical System Diagram" for the Watchtower Development (Ex. 9 at plan E-1);

- In furtherance of its actual proceeding with the Watchtower Development process, Watchtower's Narrative explained that Watchtower's meticulous "Electrical System Diagram" for the Watchtower Development provided for distribution of electricity to the main buildings underground, with transformers to be provided for each main building (Ex. 9 at p. 7 and plan E-1);

- In furtherance of its actual proceeding with the Watchtower Development process, Watchtower's Narrative further related that on-site emergency and load reduction generators would supplement the electric utility to be provided to the Watchtower Development by Orange and Rockland Utilities Inc. (Ex. 9 at p.7);

- In furtherance of its actual proceeding with the Watchtower Development process, Watchtower filed with the Town as an attachment to Watchtower's Narrative an extraordinarily detailed "Civil Utilities Plan" for the Watchtower Development (Ex. 9 at plan C-1);

- In furtherance of its actual proceeding with the Watchtower Development process, Watchtower's Narrative explained that Watchtower's meticulous "Civil Utilities Plan" for the Watchtower Development provided the precise location and size of the proposed utilities to support the Watchtower Development, including storm sewers, sanitary sewers, water/fire protection lines, electrical lines, communications lines, hydrants, and pole lights (Ex. 9 at p. 7 and plan C-1);

- In furtherance of its actual proceeding with the Watchtower Development process, Watchtower filed with the Town as an attachment to Watchtower's Narrative an extraordinarily detailed "Fire/Domestic Water Flow Diagram" for the Watchtower Development (Ex. 9 at plan FP-1);

- In furtherance of its actual proceeding with the Watchtower Development process, Watchtower's Narrative explained that Watchtower's meticulous "Fire/Domestic Water Flow Diagram" provided for fire protection distribution to be supplied to the Watchtower Development, including the "[w]ater reserve with sufficient storage to meet the flow requirements for the largest fire area" and "a loop hydrant system to allow . . . for fire department connection for firefighting" (Ex. 9 at p. 7 and plan FP-1);

- In furtherance of its actual proceeding with the Watchtower Development process, Watchtower retained the law firm of Whiteman Osterman & Hanna, LLP, One Commerce Plaza, Albany, NY ("Outside Counsel #1") in connection with its Rezoning Application, comprising of, *inter alia*, a Petition and Proposed Amendment, to amend the Town Zoning Law to allow for the Watchtower Development within the district in which the Subject Property was located ("Watchtower's Rezoning Application" or the "Rezoning") (Exs. 10, 11 and 13);

- In furtherance of its actual proceeding with the Watchtower Development process, Watchtower, by Robert Pollock and Outside Counsel #1, attended the First CDRC meeting held on February 18, 2009 in connection with the Rezoning (Ex. 11);

- In furtherance of its actual proceeding with the Watchtower Development process, in late February or early March of 2009, Watchtower submitted Watchtower's proposed zoning law amendment to the Town Attorney's Office for comment and input (Exs. 10 and 12);

- In furtherance of its actual proceeding with the Watchtower Development process, Watchtower, by Outside Counsel #1, received a list of comments and suggestions from Deputy Town Attorney Alan Berman, Esq. in connection with

Watchtower's proposed zoning law amendment addressing ten items, including, *inter alia*, the size of the dwelling units in terms of square footage and number of bedrooms, the gross density of the site based on the number of dwelling units per acre, the necessity to provide for central refuse collection areas, and the necessity of a provision that all structures must comply with the requirements of the uniform fire prevention and building code of New York (Ex. 10);

- In furtherance of its actual proceeding with the Watchtower Development process, Watchtower revised its Rezoning Application incorporating changes based upon Deputy Town Attorney Alan Berman's comments for the upcoming Second CDRC meeting  (Ex. 12);

- In furtherance of its actual proceeding with the Watchtower Development process, on March 13, 2009 Watchtower, by Robert Pollock, submitted to Deputy Town Attorney Alan Berman a revised Petition dated March 13, 2009 for an amendment to the Town Zoning Law "to permit convents and monasteries . . . along with accessory uses within the RSH District" "for the Second CDRC Meeting on March 18" (Ex. 12);

- In furtherance of its actual proceeding with the Watchtower Development process, Watchtower prepared, as "Exhibit A" to Watchtower's Rezoning Application, the precise proposed text of an "Amendment to the Zoning Law of the Town of Ramapo, New York adding: Section 376-168 Convents and Monasteries within the RSH District" (Ex. 12);

- In furtherance of its actual proceeding with the Watchtower Development process, Watchtower's Rezoning Application was reviewed by the Town's Planning and Zoning Consultants Frederick P. Clark Associates, Inc. (the "Town's Outside Zoning Consultants"), who prepared a Memorandum containing a half a page of comments regarding the Watchtower Development (Ex. 12);

- In furtherance of its actual proceeding with the Watchtower Development process, Watchtower, by Robert Pollock, together with Outside Counsel #1, attended the Second CDRC meeting held on March 24, 2009 in connection with the Rezoning (Ex. 13);

- In furtherance of its actual proceeding with the Watchtower Development process, at the Second CDRC meeting held on March 24, 2009, the CDRC requested that Watchtower "submit narrative [sic] regarding the issue of whether a Comprehensive Plan amendment is required" and suggested revisions to "the proposed Zoning Petition, including, but not limited to, proposed kitchen facilities, inclusion of a superintendent dwelling unit as part of the overall density and a buffer requirement" (Ex. 13);

- In furtherance of its actual proceeding with the Watchtower Development process and as a follow-up to the Second CDRC meeting held on March 24, 2009,

Watchtower next submitted to the Town a revised Zoning Petition, dated April 14, 2009 and "Exhibit A" "Amendment to the Zoning Law of the Town of Ramapo, New York adding:" "Section 376-5 Definitions," "Section 376-168 Convents and Monasteries within the RSH District" and "Amendment to Table of General Use Requirements Section 376-31; District: RSH," dated April 14, 2009 (Ex. 14);

- In furtherance of its actual proceeding with the Watchtower Development process and in response to the CDRC's request reflected in the minutes of the Second CDRC Meeting held on March 24, 2009 regarding the "Watchtower Administrative Center" (*see* Ex.13, §5 "[a]pplicant to submit narrative regarding the issue of whether a Comprehensive Plan amendment is required"), Watchtower submitted a narrative entitled "Watchtower Bible and Tract Society Proposed Zoning Amendment Permitting Monasteries and Convents in RSH Zoning District Consistency with Town of Ramapo Comprehensive Plan (dated January 2009)," dated April 13, 2009 ("Watchtower's Zoning Amendment Analysis") (Ex. 15);

- In furtherance of its actual proceeding with the Watchtower Development process, Watchtower's Zoning Amendment Analysis was prepared with one column entitled "Comprehensive Plan Requirements" and an opposite column entitled "Consistency of Proposed Zoning Amendment with Comprehensive Plan" (Ex. 15);

- In furtherance of its actual proceeding with the Watchtower Development process, Watchtower's Zoning Amendment Analysis addressed item by item how Watchtower's proposed Zoning Amendment was fully consistent with the Town's Comprehensive Plan (Ex. 15);

- In furtherance of its actual proceeding with the Watchtower Development process, the CDRC, upon consideration of all of the aforementioned submissions by Watchtower and Outside Counsel #1, concluded at the Second CDRC Meeting of March 24, 2009 that:

> Applicant to submit proposed Zoning Petition to Town Clerk for consideration by the Town Board.

(Ex. 13 at §6);

- In furtherance of its actual proceeding with the Watchtower Development process, Watchtower filed a duly certified grievance with the BAR on or about May 26, 2009 appealing the denial of Watchtower's First Tax Exemption Application and certified by Watchtower as true subject to the penalties of New York's Penal Law (Ex. 16);

19

- In furtherance of its actual proceeding with the Watchtower Development process, Watchtower's commenced an action on July 30, 2009 against the Town, the Tax Assessor, and the BAR in the Supreme Court of the State of New York, County of Rockland under Index No. 8111/2009 ("Watchtower's State Court Litigation"), by the filing of a Notice of Petition and duly sworn Petition dated July 29, 2009 ("Watchtower's Verified Petition") seeking to overturn the Town's denial of RPTL Section 420-(a)(1) and (3)(a) real property tax exemption for the tax year 2009/2010, which Petition, *inter alia*, annexed as Exhibit G thereto Watchtower's First Tax Exemption Application (Ex. 17)[16];

- In furtherance of its actual proceeding with the Watchtower Development process, Watchtower advised your Affiant in an August 14, 2009 e-mail that, in sum and substance, upon its Board's approval[17] of the Community Benefit Agreement with the Town for the Watchtower Development and after another application with the Town had "died down some," Watchtower would conclude the Rezoning (Ex. 18; *see also* Ex. 13 at §6);

- In furtherance of its actual proceeding with the Watchtower Development process, Watchtower retained "Outside Counsel #2" (Montalbano, Condon & Frank, P.C., 67 North Main Street, New City, NY) to assist with Watchtower's successful negotiation and consummation of the Community Benefit Agreement (Exs. 19 and 32);

- In furtherance of its actual proceeding with the Watchtower Development process, and with the assistance of Outside Counsel #2, Watchtower concluded the negotiation of and proceeded with its execution of the comprehensive Community Benefit Agreement with the Town for the Watchtower Development, an Agreement with a term of approximately five (5) years, *i.e.* a term extending almost (3) years ***beyond*** the expiration of the Two Year Period (Ex. 19);

---

[16]    Despite a thorough search of the Rockland County Clerk's records, a copy of Exhibit G and Exhibit I to Watchtower's Verified Petition could not be located at the clerk's office and were not included in the Rockland County Supreme Court's case file. *See* Affidavit of Susana Tovar of Action Subpoena, Inc., sworn to August 19, 2011 at Ex. 33.    Nonetheless, Watchtower's First Tax Exemption Application referenced as Exhibit "G" thereto was obtained by Lorterdan from the records of the Tax Assessor and is at Ex. 5 hereto.

[17]    Watchtower's Board admittedly approved the Community Benefit Agreement, an instrument fully executed by Watchtower and the Town, and made effective as of September 1, 2009, but Watchtower still failed to conclude the Rezoning process it had essentially completed between February and April of 2009. In addition, the performance by both Watchtower and the Town of the terms and provisions of the Community Benefit Agreement throughout the Two Year Period, as well as Watchtower's performance thereunder ***after*** the Notice of Sale and ***after*** the expiration of the Two Year Period, is also indisputable on this record and further evidence totally irreconcilable with any claim that Watchtower did not determine to proceed (and in fact proceed) herein.

- In furtherance of its actual proceeding with the Watchtower Development process, Watchtower donated to the Town $300,000 pursuant to Section 1(a) of the Community Benefit Agreement upon its execution thereof (Ex. 19 at §1(a) and Ex. 20);

- In furtherance of its actual proceeding with the Watchtower Development process, Watchtower agreed in the Community Benefit Agreement, as a binding condition of the requisite Site Plan Approval for the Watchtower Development, to donate up to $700,000 to the Town toward the purchase of a new fire truck for the fire district encompassing the Watchtower Development (Ex. 19 at §8);

- In furtherance of its actual proceeding with the Watchtower Development process, Watchtower committed in the Community Benefit Agreement to extend, at Watchtower's sole cost and expense, the necessary sewer lines to the Subject Property during its construction of the Watchtower Development upon receipt of necessary town approvals therefor, a costly commitment I previously estimated at approximately $250,000 (Ex. 19 at §8);

- In furtherance of its actual proceeding with the Watchtower Development process, Watchtower agreed to many other, separate, and additional financial commitments enumerated in the Community Benefit Agreement in excess of $1 Million, of which approximately $550,000 was donated by Watchtower to the Town during the Two Year Period in furtherance of the Watchtower Development (Ex. 19 at §1 and Exs. 20-21);

- In furtherance of its actual proceeding with the Watchtower Development process, Watchtower successfully negotiated with the Town and proceeded with execution of a favorable Stipulation of Settlement dated October 29, 2009 of Watchtower's State Court Litigation whereby the Town acknowledged Watchtower's entitlement to complete real property tax exemption for the Subject Property for the tax year 2009/2010 (Ex. 22);

- In furtherance of its actual proceeding with the Watchtower Development process, Watchtower obtained a favorable Court Order from the Supreme Court of the State of New York, County of Rockland (LaCava, J.), dated February 2, 2010 and entered on February 11, 2010, adopting Watchtower's position in Watchtower's State Court Litigation that it was entitled to complete RPTL Section 420-(a)(1) and (3)(a) real property tax exemption for the Subject Property for the tax year 2009/2010 (the "Order") (Ex. 23);

- In furtherance of its actual proceeding with the Watchtower Development process, Watchtower obtained a favorable determination on February 23, 2010 from the Tax Assessor adopting Watchtower's position in Watchtower's First Tax Exemption Application, Watchtower's 2009 Grievance, and Watchtower's State Court Litigation that Watchtower was entitled to complete RPTL Section 420-a(1) and (3)(a) real property tax exemption for the tax year 2009/2010 (Ex. 24);

21

- In furtherance of its actual proceeding with the Watchtower Development process, Watchtower honestly and truthfully completed, signed, and certified its Second Tax Exemption Application entitled "Renewal Application for Real Property Tax Exemption for Nonprofit Organizations II – Property Use," dated February 25, 2010, filed with the Tax Assessor on March 1, 2010, seeking complete real property tax exemption for the tax year 2010/2011, encompassing a requested exemption period extending several months *beyond* the expiration of the Two Year Period, reaffirming therein all of the sworn declarations and representations set forth in Watchtower's First Tax Exemption Application (Exs. 5 and 25);

- In furtherance of its actual proceeding with the Watchtower Development process, Watchtower obtained a favorable determination on May 1, 2010 from the Tax Assessor adopting Watchtower's position in Watchtower's Second Tax Exemption Application that it was entitled to complete RPTL Section 420-a(1) and (3)(a) real property tax exemption for the tax year 2010/2011, a period of time inclusive of exemption for approximately ten months *beyond* the expiration of the Two Year Period (Ex. 26); and

- In furtherance of its actual proceeding with the Watchtower Development process, Watchtower donated to the Town $250,000 on or about September 21, 2010 pursuant to Section 1(b) of the Community Benefit Agreement (Ex. 19 at §1(b) and Ex. 21).

48.     Despite all of the above unequivocal and repeated reaffirmations of its determination to proceed, and notwithstanding the overwhelming documentary evidence of its actual proceeding herein (Exs. 5-21 and 25), Watchtower had the temerity to issue the Notice of Sale to Lorterdan on November 1, 2010 (Ex. 4), and has the same audacity to now claim that its clearly deliberate withholding of "notice" of its determination to proceed is a "defense" to Lorterdan's action and the Motion.

49.     Simply stated, Watchtower would have this Court entertain the preposterous position that by *never* giving the required notice to Lorterdan, notwithstanding Watchtower's clear determination to proceed (and even notwithstanding its actual proceeding demonstrated beyond cavil on this record), Watchtower could forever avoid payment of the $9.5 Million due and owing within ten (10) days of such determination.  I am informed that the law does not allow

Watchtower to rely upon its own wrongful and deliberate *failure* to provide notice as a means of evading its payment obligation to Lorterdan under Section 4(a) of the Consulting Agreement. *See* Memorandum of Law at Point V.

50.     Further, I am informed by counsel that Watchtower's "position" is also a clear breach of the covenant of good faith and fair dealing and clearly barred by New York law on that basis as well. *See* Memorandum of Law at Point V.

## WATCHTOWER'S NOTICE OF SALE AND WAIVER THEREOF

51.     Given Watchtower's repeated confirmation and reconfirmation again and again of its determination to proceed (and even notwithstanding its actual proceeding with the Watchtower Development process) (*see* Exs. 5-21 and 25), to my astonishment, on or about November 1, 2010, about 20 months[18] after Closing, your Affiant received "out of left field" the Notice of Sale purporting to claim, in sum and substance, that:

    (i)    Watchtower had never previously determined to proceed (or proceeded) in the previous 20 months which followed Closing; and

    (ii)    Watchtower was giving Lorterdan six months notice of its sale of the Subject Property back to Lorterdan for the sum of $11.5 Million.

Ex. 4.

52.     By the Notice of Sale, Watchtower thus notified Lorterdan of its complete refusal to pay the Balance Due and, even more egregiously, based upon all of the documentary evidence attached hereto, I believe that Watchtower deliberately tried to swindle Lorterdan into either paying $11.5 Million for the Subject Property despite Watchtower having knowingly determined

---

[18]     The Notice of Sale was also sent less than 45 days after Watchtower had just donated to the Town $250,000 under Section 1(a) of the Community Benefit Agreement, with Watchtower's next annual donation not coming due until well after the expiration of the Two Year Period, on September 1, 2011. Exs. 4, 19 and 21.

to proceed, or, far more likely, Watchtower attempted to strong-arm Lorterdan into a gigantic "haircut" on the agreed total purchase price of $21 Million.

53.     Although only a layperson, I cannot imagine that the law can allow Watchtower to determine to proceed as evidenced indisputably by Watchtower's very First Tax Exemption Application for purposes of real property tax exemption as well as *both* renewals thereof (*i.e. before and after* the Notice of Sale), and, notwithstanding its actual proceeding with the Watchtower Development process, *simultaneously* allow Watchtower to speak out of both sides of its mouth and disingenuously "claim" to Lorterdan in the Notice of Sale that it had not already determined to proceed and had also never actually proceeded with the Watchtower Development process.

54.     I am further informed by counsel that perhaps the *most striking* of the many compelling and unequivocal examples of Watchtower's *explicit* waiver as a matter of law of its claimed rights under the Notice of Sale (which waiver I am advised is dispositively established on the law both by Watchtower's unambiguous declarations and conduct *prior to and subsequent* to the Notice of Sale, *see* Memorandum of Law at Point III) are the representations set forth in Watchtower's duly certified public filings with the Town made several months *following* the Notice of Sale but prior to the May 1, 2011 closing date noticed therein.  *See* Memorandum of Law at Point III.

55.     Indeed, in Watchtower's *Third* Tax Exemption Application, duly certified as true subject to New York's Penal Law on February 25, 2011 (Ex. 27),[19] Watchtower plainly and unambiguously disclaimed having noticed the sale of the Subject Property to anyone, let alone having specifically just noticed the sale thereof only a few months earlier to Lorterdan, a for-

---

[19]     I am advised that all instruments offered for filing with a public office or public servant are subject to the provisions of the New York Penal Law.

profit private party having no entitlement whatsoever to real property tax exemption! *See* Ex. 27 and *compare* to the Notice of Sale at Ex. 4.

56.     Here, Watchtower's duly certified Third Tax Exemption Application form openly, plainly and notoriously *directed* Watchtower, in seeking real property tax exemption under RPTL Section 420-a, to truthfully and completely respond to the following pointed and prominent question:

> 2. Have *any of the following changes occurred* since application for this property tax exemption was last filed? If any of the listed changes have occurred, please give a *detailed explanation* of each change on the back of this form, check the appropriate line below, and complete and sign the statement.  If none of the changes has occurred, please check the appropriate line below and complete and sign the statement.

Ex. 27 at §2 (emphasis supplied).

57.     As relevant and again, respectfully, dispositive here, Question 2 of Watchtower's Third Tax Exemption Application, duly certified to months *after* the Notice of Sale, directed Watchtower to truthfully and completely verify under oath whether or not:

> c. a change has occurred in that all or part of the *property is now being offered for sale* or lease.

Ex. 27 at §2c (emphasis supplied).

58.     In response, Watchtower, nearly *four months* after having issued the Notice of Sale advising Lorterdan that, as Seller, it was selling the Subject Property back to Lorterdan, as Purchaser, for the sum of $11.5 Million, duly certified subject to New York's Penal Law that such a dramatic change in the prior status-quo "since application for this property tax exemption was last filed" on March 1, 2010, had *no* application whatsoever to Watchtower and the Subject Property between then and February 25, 2011. Exs. 25 and 27.

59.     Considering the terms and timing of the Notice of Sale dated November 1, 2010, the aforesaid certified declaration by Watchtower on February 25, 2011 is entirely irreconcilable and inconsistent with the Notice of Sale.  Indeed, I am informed by counsel that this glaring inconsistency by Watchtower allows no opportunity for a reasonable inference other than Watchtower's complete relinquishment, abandonment and waiver of all claimed rights under the Notice of Sale as a matter of law.  This is the case irrespective of the fact demonstrated on this record that Watchtower had long before determined to proceed (and in fact proceeded) and the Notice of Sale thus demonstrates yet *another* breach by Watchtower on this record.  *See* Memorandum of Law at Point III.

60.     Watchtower's Third Tax Exemption Application, in and of itself, was a renewal of Watchtower's First Tax Exemption Application and, by the clear instructions to applicants applicable to renewal applications, a renewal is to begin with essentially a re-filing of the first *granted* tax exemption application, and the representations contained therein.  The combination on this record of such renewal and disavowal of all changes regarding "sale" leaves no facts to find or try in the case at bar.  Ex. 5 at p. 4 and Ex. 27.

61.     In addition, on February 27, 2011, and pursuant to Sections 2, 4(b), and 6 of the Consulting Agreement and paragraph 2 of the Repurchase Agreement, the Two Year Period ended, thereby precluding thereafter any possibly valid Notice of Sale from Watchtower to Lorterdan.  Accordingly, and in the alternative, I am advised that Watchtower's separate waiver as a matter of law of the Notice of Sale on February 25, 2011 (Ex. 27 at §2c) left no time remaining to even attempt to issue a "new" and even potentially valid Notice of Sale under the Agreements even if one assumes, *arguendo*, that long before the Notice of Sale Watchtower was not already indebted to Lorterdan for the Balance Due, and precluded from its "claims" as set

forth in the Notice of Sale for all of the multiple reasons recited hereinabove and in the accompanying Memorandum of Law.  *See* Ex. 2 at §§2, 4(b), and 6 and Ex. 3 at §2.

62.     Moreover, and in stark contrast to Watchtower's other claim in the Notice of Sale (*i.e.* that it had determined not to proceed and had never proceeded), but consistent with its duplicity and "double-speak" throughout, Watchtower further confirmed in Watchtower's Third Tax Exemption Application, Form "RP-420-a/b-Rnw-I (9/08)," that it had "retained several professionals, including attorneys, engineers and others related to *property development* and other matters," another baffling and irreconcilable inconsistency with the Notice of Sale. Ex. 27, Form "RP-420-a/b-Rnw-I (9/08)," Schedule A at 3d (emphasis supplied).

63.     Furthermore, Watchtower's Third Tax Exemption Application placed so much emphasis upon any changes occurring between March 1, 2010 and February 25, 2011 that it required Watchtower, on the bottom of the same page which required Watchtower to identify and provide full details of any offered sale, to certify to the following:

### STATEMENT OF CHANGE

> I hereby certify that *all of the changes, as listed above, that have occurred since application for exemption was last filed have been noted* and the explanations of such charges [sic] are true and correct to the best of my knowledge and belief.

Ex. 27 (emphasis supplied).

64.     The record is clear that Watchtower did not mention or "note" anything in regard to the Notice of Sale, which, *if Watchtower even considered such notice to be of any force or effect*, was undoubtedly a *major* change involving Watchtower and the Subject Property which had allegedly occurred "since application for exemption was last filed." Exs. 4, 25, and 27.

65.     Watchtower's execution of this certification on February 25, 2011,[20] I am advised, is another clear waiver on the law of the Notice of Sale.  *See* Memorandum of Law at Point III(B).

66.     At no time as of February 27, 2011 had Watchtower ever sent notice to Lorterdan advising that it had withdrawn the Notice of Sale, nor had Watchtower ever hinted at its intention or desire to treat same as a nullity (which it was).

67.     Next, on April 20, 2011, Watchtower's Third Tax Exemption Application was denied by the Tax Assessor.  Ex. 28.

68.     Not satisfied with the Tax Assessor's denial, Watchtower, exactly as it did two years earlier, proceeded to appeal and file a grievance with the BAR ("Watchtower's 2011 Grievance").  Ex. 29.

69.     In Watchtower's 2011 Grievance, Watchtower reiterated its claimed satisfaction of all applicable statutory criteria under RPTL Section 420-a(1) and (3)(a), including that there certainly had been no sale of the Subject Property noticed or offered by Watchtower as owner, *i.e.* no such change involving any sale offering at any time in the preceding year.   Ex. 29.

70.     Watchtower's 2011 Grievance form, exactly like Watchtower's Third Tax Exemption Application form, expressly, prominently, and boldly required Watchtower to disclose if:

> ___ Property has been ***recently offered for sale*** (attach copy of listing agreement, ***if any***):

Ex. 29 (emphasis supplied).

---

[20]    The Two Year Period ended two days later on February 27, 2011, and in the alternative, on that date given the referenced waiver represented by Watchtower's Third Tax Exemption Application, Watchtower became indebted to Lorterdan for the Balance Due pursuant to Section 4(b) of the Consulting Agreement.

71.     Again, Watchtower, on April 28, 2011, nearly *six months* after having issued the Notice of Sale claiming to Lorterdan that, as Seller, it was allegedly selling the Subject Property back to Lorterdan for the sum of $11.5 Million, duly certified subject to New York's Penal Law that the Subject Property had *not* been recently offered for sale to anyone.  Ex. 29.

72.     Accordingly, not only did Watchtower *again* disavow that the Subject Property had been recently offered for sale back to Lorterdan in and by the Notice of Sale, but, in addition, on the final page of Watchtower's 2011 Grievance form, Watchtower duly certified and reconfirmed as follows:

**PART FIVE: CERTIFICATION**

I certify that all statements made on this application are true and correct to be [sic] best of my knowledge and belief, and I understand that the making of any willful false statement of material fact herein will subject me to the provisions of the Penal Law relevant to the making and filing of false instruments.

Ex. 29.

73.     Given the plain meaning of Watchtower's Notice of Sale and of Sections 2 through 2.8 of the Repurchase Agreement, coupled with the undeniable fact that a sale by Watchtower by Warranty Deed had clearly been noticed on November 1, 2010 pursuant to the Notice of Sale, Watchtower cannot engage in semantics and seriously try to hide behind the word "repurchase" set forth in the Repurchase Agreement and thereby claim that a *sale* of the Subject Property had not been invoked or offered by Watchtower in the Notice of Sale.  Exs. 3 at §§2-2.8.

74.     There can be no such pedantic and/or semantic claim by Watchtower, for the simple reason that, *inter alia*, (i) it would be absurd on its face and (ii) the Notice of Sale pursuant to Sections 2 through 2.8 of the Repurchase Agreement expressly incorporated by

reference selected "sale" provisions from the PSA.   Ex. 1 at §4 and Ex. 3 at §2.3.   No doubt, such a specious and self-serving "claim" or "defense" on this record would defy the credulity of even the *most* patient trier of fact.

75.     Thus, the specific provisions of the PSA which were expressly incorporated by reference in the Repurchase Agreement provided that, *inter alia*, in the event a Notice of Sale was ever issued by Watchtower during the Two Year Period, all of the obligations imposed originally upon the **Seller** as set forth in Section 4 of the PSA would then apply to **Watchtower** and "the word '**Seller**' in the PSA shall be replaced with '**Watchtower**.'" Ex. 3 at §2.3 (emphasis supplied).

76.     It is hence unassailable that the Notice of Sale noticed a **sale** by Watchtower, as Seller, to Lorterdan, as Purchaser, by Warranty Deed to be delivered by Watchtower at closing within six months, *i.e.* on or before May 1, 2011.  *See* Ex. 1 at §4 and Ex. 3 at §§2.1, 2.3, and 2.4.   It can thus only be concluded that Watchtower's failure to reflect any such "change" was either Watchtower's recognition that the Notice of Sale was always of no force or effect, or, at the bare minimum, knowingly waived by Watchtower's multiple certifications that the Subject Property had not been offered (or noticed) for sale by the applicant for tax exemption.

77.     For illustrative purposes, the chart below **contrasts** and **highlights** the complete inconsistency between: (a) the Notice of Sale on the one hand and (b) Watchtower's Third Tax Exemption Application and Watchtower's 2011 Grievance on the other.

| The Notice of Sale | Watchtower's Third Tax Exemption Application, duly certified on February 25, 2011 subject to New York's Penal Law |
|---|---|
| "Watchtower hereby gives, and this letter constitutes, written notice to Lorterdan that Watchtower has determined that it will not proceed with its intended development of the Property . . . *Accordingly, pursuant to the terms of the Repurchase Agreement, Lorterdan shall repurchase the Property from Watchtower.*"<br><br>"The notice provided by this letter *requiring Lorterdan to repurchase the Property pursuant to the Repurchase Agreement . . .*"<br><br>"During the *process of repurchasing the Property*, you may deal directly with Mr. Daniel Rice . . . *[r]egarding the legal details of the repurchase . . .*"<br><br>"On behalf of Watchtower, we look forward to working with you and your attorneys to *complete the repurchase transaction* in a smooth and timely fashion."<br>Ex. 4 (emphasis supplied). | Watchtower duly certified subject to the penalties of the NY Penal Law that the following did *not* apply at any time between March 1, 2010 and February 25, 2011:<br><br>a change has occurred in that all or part of the *property is now being offered for sale* or lease.<br><br>Ex. 27 (emphasis supplied).<br><br>**Watchtower's 2011 Grievance, duly certified on April 28, 2011 subject to New York's Penal Law**<br><br>Watchtower duly certified subject to the penalties of the NY Penal Law that the following did *not* apply as of April 28, 2011:<br><br>\_\_\_\_ Property has been *recently offered for sale* (attach copy of listing agreement, if any):<br><br>Ex. 29 (emphasis supplied). |

78.    In the few months that have elapsed since my attorneys obtained several of the public records forming a part of this Motion record through FOIL requests provided to the Town Clerk, I have been unable to, and cannot imagine how anyone could even try to reconcile the Notice of Sale with Watchtower's Third Tax Exemption Application and Watchtower's 2011 Grievance, both of which were filed and certified by Watchtower only a few months *after* the Notice of Sale in regard to the same real property.  Exs. 4, 27, and 29.

79.    In this regard, my attorneys advise me that a waiver is proved as a matter of law by the express declarations of a party or by its undisputed acts "so inconsistent" to stand upon its

rights as to leave no opportunity for a reasonable inference to the contrary other than such waiver.  *See* Memorandum of Law at Point III.

80.     On this record, Watchtower's determination to proceed on February 27, 2009 (as repeatedly reconfirmed), as well as its actual proceeding with the Watchtower Development process, is "so inconsistent" with a determination ***not*** to proceed and to purportedly exercise a "right" to sell the Subject Property back to Lorterdan on such grounds that, respectfully, it must be deemed a waiver as a matter of law of the claimed right subsequently asserted by Watchtower in the Notice of Sale.  *See* Memorandum of Law at Point III.

81.     So too, ***after*** issuance here of (its already waived right to issue) the Notice of Sale to Lorterdan, Watchtower undeniably again acted thereafter "so inconsistently" with the claimed rights of the Notice of Sale in Watchtower's Third Tax Exemption Application and 2011 Grievance as to leave no opportunity for any reasonable conclusion other than another waiver of any claimed right asserted in the Notice of Sale as a matter of law.  *See* Memorandum of Law at Point III.

### THE NOTICE OF SALE
### WAS AND IS BARRED BY JUDICIAL ESTOPPEL

82.     I am further informed that the doctrine of judicial estoppel applies:

> (a) Where a party takes a position that is inconsistent with one taken and adopted in a prior proceeding by that tribunal (judicial or administrative) to which the earlier position had been advanced; and/or

> (b) Where a party attempts to make a mockery of the Courts and plays "fast and loose" by submitting self-serving and contradictory sworn positions depending, so to speak, on the "day of the week" and position it "needs" to take in the last forum presently addressing the same underlying

issues.

*See* Memorandum of Law at Point IV.

83.     As applied here, after the Tax Assessor's denial of Watchtower's First Tax Exemption Application (Ex. 30) and affirmance thereof by the BAR (Ex. 31), Watchtower commenced Watchtower's State Court Litigation on July 30, 2009. Ex. 17.

84.     In Watchtower's State Court Litigation, Watchtower claimed that the Tax Assessor and BAR committed a grave legal error and injustice in that the Town's assessment of Watchtower's "real property is illegal in that it has failed to grant and acknowledge [Watchtower's] *legal right to exemption* from property taxes" on the Subject Property "pursuant to RPTL Section 420-a." Ex. 17 at paragraph TWENTY-THIRD (emphasis supplied).

85.     As demonstrated in the accompanying Memorandum of Law, to be entitled to RPTL Section 420-a(1) and (3)(a) real property tax exemption for the vacant Subject Property and apply therefor in good faith, there *must* be evidence of overt acts by the applicant demonstrating its determination and commitment to the commencement of construction not yet in progress pursuant to concrete and definite plans.

86.     In this regard, I am advised that (i) preparation of a plan detailing the project [here, the Watchtower Architectural Site Plan], (ii) a resolution (or equivalent evidence of organizational approval) adopted by the applicant approving the plan, and, commitment of the necessary resources to pay for the buildings and improvements reflected on the plan coupled with (iii) the representation that construction would begin upon receipt of necessary approvals, [Watchtower so verified to *all* of the foregoing in Watchtower's First Tax Exemption Application], clearly evidenced Watchtower's plain and unambiguous overt acts in this regard; to wit: its determination to proceed pursuant to concrete and definite plans. *See* Memorandum of

Law at Points I and II; Ex. 5.

87.     Yet, not only did Watchtower clearly and unambiguously so verify in Watchtower's First Tax Exemption Application, it also so certified in Watchtower's 2009 Grievance, and reaffirmed the same again in its *sworn* pleadings filed in Watchtower's State Court Litigation. *See* Exs. 5, 16 and 17.

88.     Shortly thereafter, Watchtower's position in Watchtower's State Court Litigation was adopted by the Supreme Court, Rockland County by the Order, ordering and declaring that the Subject Property as owned and applied for by Watchtower was "one hundred (100%) percent exempt from taxation for the 2009/2010 tax year." Ex. 23.

89.     Having succeeded in obtaining a judicial Order granting it tax exemption because of its sworn representations in Watchtower's First Tax Exemption Application attached to and made a part of Watchtower's Verified Petition in Watchtower's State Court Litigation, as demonstrated in this record, I am advised that Watchtower is judicially estopped from impeaching Watchtower's First Tax Exemption Application including Watchtower's true, correct and complete sworn representation that it had determined to begin construction of the Watchtower Development "as soon as," *inter alia*, all necessary approvals could be obtained, now that its interests have allegedly changed. Thus, Watchtower's defense in this Action cannot raise a question of fact, respectfully, without trampling upon all of Watchtower's aforementioned sworn representations and filings incorporated by reference by Watchtower in Watchtower's State Court Litigation. Exs. 5 and 17.

90.     Thus, Lorterdan's counsel explains that, on this record, Watchtower is now barred as a matter of law from asserting that it did not verify on February 27, 2009, in its true, correct and complete application filed by law, as required under RPTL Section 420-a(1) and (3), that it

had concrete and definite plans to begin construction of the Watchtower Development. As such Watchtower is judicially estopped from claiming that it did not determine to proceed with the Watchtower Development. *See* Memorandum of Law at Points III and IV.

91.     Simply stated, Watchtower essentially asks this Court to disregard this entire Motion record as "extrinsic evidence," including, *inter alia*, Watchtower's duly verified and/or certified and filed tax exemption applications and Watchtower's pleadings and its success in Watchtower's State Court Litigation, as evidenced by the Order entered on February 11, 2010. *See* Exs. 5, 16, 17, 23, 25 and 27.

92.     Respectfully, to even entertain Watchtower's request that the Court, essentially, look the other way, would allow every litigant to constantly change its position taken and adopted by one court with respect to the same subject matter simply because it is subsequently before a different court (*i.e.* this Court in 2011) and its interests have allegedly changed, or, as is quite apparent here, its duplicity has been glaringly exposed to the full, bright light of day.

93.     I am thus advised that judicial estoppel intervenes to prevent such a blatant "flip-flop" and misuse of the Courts.

94.     I am also informed that the ***Town's*** granting on May 1, 2010 of 100% tax exemption for the tax year 2010/2011 based upon Watchtower's duly certified ***Second*** Tax Exemption Application constitutes a wholly separate judicial estoppel involving the favorable adoption of Watchtower's position by an administrative agency (the Tax Assessor's Office) in Watchtower's Second Tax Exemption Application, thereby precluding Watchtower from relying upon the completely inconsistent and irreconcilable Notice of Sale "position" herein. *See* Exs. 25 and 26 and Memorandum of Law at Point IV(B).

95.     Moreover, that Watchtower is playing "fast and loose" with this Court is

unequivocally evidenced by Watchtower's obvious attempt to impeach Watchtower's First Tax Exemption Application, Watchtower's 2009 Grievance, Watchtower's Verified Petition filed in Watchtower's State Court Litigation, the Order, Watchtower's Second Tax Exemption Application, and perhaps the most egregious and flagrant example of playing "fast and loose" with this Court imaginable is Watchtower's attempted impeachment of *both* Watchtower's Third Tax Exemption Application dated February 25, 2011 and Watchtower's 2011 Grievance where Watchtower denied, *twice*, that any change involving any potential sale of the Subject Property had arisen since Watchtower's Second Tax Exemption Application was filed on March 1, 2010, an intervening time period which admittedly *encompassed* the totally unanticipated Notice of Sale dated November 1, 2010 which surfaced approximately 8 months *after* Watchtower's Second Tax Exemption Application and approximately 4 months *before* Watchtower's Third Tax Exemption Application.  Exs. 4, 5, 16, 17, 25, 27 and 29.

96.     Accordingly, I am advised that on this additional basis of judicial estoppel Watchtower's defense herein predicated upon the Notice of Sale fails to create any legal "defense" or any genuine issue of material fact to be found or tried.  *See* Memorandum of Law at Point IV(C).

## WATCHTOWER BREACHED "THE REZONING PROVISION"
## OF SECTION 2.9 OF THE REPURCHASE AGREEMENT

97.     Section 2.9 of the Repurchase Agreement (the "Rezoning Provision") expressly

provided that:

> Watchtower *covenants and agrees that if, within the 2-Year Period the Town of Ramapo rezones the Property pursuant to an application filed by Watchtower* in furtherance of the Development, *then Watchtower shall forthwith pay Lorterdan the Compensation as defined in the Consulting Agreement [$9.5 million].*  This provision shall not prohibit Watchtower from filing and prosecuting applications for any approval required for the Development.

Ex. 3 at §2.9 (emphasis supplied) (brackets added).

98.     The Rezoning Provision, an alternative milestone triggering prompt payment of

the Balance Due upon Town approval of Watchtower's Rezoning Application, clearly

conditioned Watchtower's payment of the Balance Due upon the Town's rezoning of the Subject

Property *pursuant to an application filed by Watchtower*.  Ex. 3 at §2.9.  Here, at all times, a

good faith effort to satisfy the Rezoning Provision was *solely* within Watchtower's control.

99.     I am informed that, on this record, Watchtower cannot dispute that Watchtower

covenanted, in good faith, to use its best efforts to *file* a final Rezoning Application once

Watchtower *voluntarily* elected in Watchtower's First Tax Exemption Application to tie its

commencement of construction of the Watchtower Development to "as soon as," *inter alia*, all

necessary approvals could be obtained, especially in light of the further fact that Watchtower

proceeded with the Rezoning Application process with, *inter alia*, its CDRC Application and

EAF Statement filed with the CDRC in connection with the Rezoning.

100.    Similarly, it is indisputable that Town approval of a Rezoning Application was

impossible without good faith "application therefor" by Watchtower.

37

101.    Despite having duly sworn, *inter alia*, that construction would commence "as soon as necessary Town and other approvals for the development are obtained" (Ex. 5), despite, *inter alia*, attending two CDRC meetings, submitting multiple drafts of a Petition and Proposed Zoning Amendment to the Town Attorney in March and April of 2009, and then despite notifying me in writing in August of 2009, in sum and substance, that Watchtower would conclude the Rezoning upon, *inter alia*, its Board's approval of the Community Benefit Agreement, Watchtower, again in the utmost bad faith, and in breach of the covenant of good faith and fair dealing, *never* concluded the Rezoning Application process they had essentially finished with the assistance of Outside Counsel #1 and Town input thereon months before. *See* Exs. 10-15 and 18.

102.    This bad faith by Watchtower is rendered more egregious by the fact that Watchtower commenced the Rezoning Application process in February of 2009, made great progress thereunder *and* its Board duly approved the Community Benefit Agreement approximately one *year* before Watchtower's unlawful Notice of Sale. *See* Exs. 6-15 and 19.

103.    By never filing the Rezoning Application, already reviewed by the CDRC, with the Town Clerk (*see* Ex. 13 at §6 "[a]pplicant to submit proposed Zoning Petition to Town Clerk for consideration by the Town Board"), Watchtower deliberately and unilaterally "guaranteed" that the Town would *never* act to amend the Town Zoning Law so it could essentially eliminate unilaterally the Section 2.9 Repurchase Agreement milestone.[21]

---

[21]    Parenthetically, it is worth noting that Watchtower's bad faith is even more pronounced considering the fact that Watchtower knew the Rezoning was its for the asking right after Closing. Such Town approval "on a silver platter" is only further reinforced by the fact that the same Town Board vested with exclusive jurisdiction over the Rezoning approved the long-term Community Benefit Agreement with Watchtower, even negotiating Site Plan conditions "for" the Planning Board with Watchtower, with Site Plan conditions only being of relevance after the Town Board's rezoning of the Subject Property. *See* Ex. 34.

104.    Watchtower's egregious bad faith in failing to follow the directions of the CDRC to submit its Rezoning Application to the Town Board immediately after the Second CDRC Meeting (Ex. 13 at §6) only reinforces my belief that from the very moment of Closing, Watchtower was constantly maneuvering with malice aforethought to try to keep the Subject Property without payment of the Balance Due.

105.    As a result, I am also advised by counsel that Watchtower cannot hide behind the absence of Town approval of the Rezoning Application.   Again, no question of material fact exists vis à vis Watchtower's breach, in bad faith, of its legal obligations in regard to Section 2.9 of the Repurchase Agreement and the Rezoning Application on this record.  *See* Memorandum of Law at Point V.

**LORTERDAN SHOULD BE AWARDED REIMBURSEMENT
OF ATTORNEYS' FEES AND COSTS FROM WATCHTOWER**

106.    The   PSA,   Consulting   Agreement,   and   Repurchase   Agreement   also unambiguously provided that "in the event of any litigation arising" out of the Agreements, the prevailing party is entitled to reimbursement of its attorneys' fees and costs of litigation.  Ex.  1 at §12.10, Ex. 2 at §9 and Ex. 3 at §2.12.

107.    It is hence respectfully requested that Lorterdan be awarded reimbursement of attorneys' fees and costs incurred.

## CONCLUSION

108.    In light of the above, I am informed that Watchtower's liability to Lorterdan for the sum of $9.5 Million, together with interest at the legal rate from March 10, 2009, attorneys' fees, costs and disbursements, is established on the law as a result of, *inter alia*:

(a)    Watchtower's determination to proceed with the Watchtower Development at the outset of the Two Year Period;

(b)    Watchtower's breach of its obligations under Section 4 of the Consulting Agreement;

(c)    Watchtower's breach of the covenant of good faith and fair dealing throughout the Two Year Period;

(d)    Watchtower's pre-November 1, 2010 waiver of any right to issue the purported Notice of Sale herein;

(e)    Watchtower's post-November 1, 2010 waiver of the wrongfully issued purported Notice of Sale herein;

(f)    the doctrine of Judicial Estoppel; and

(g)    Watchtower's breach of its obligations vis à vis the Rezoning Application under Section 2.9 of the Repurchase Agreement.

**WHEREFORE**, your Affiant respectfully submits that Lorterdan's Motion should be granted and Judgment entered:

1.    Declaring that Watchtower:

    a.    Determined to proceed with the Watchtower Development on February 27, 2009, upon its filing of Watchtower's First Tax Exemption Application which, *inter alia*, verified, in sum and substance, internal organizational approval of the Watchtower Development, Watchtower's commitment of its own resources to pay for the Watchtower Development buildings and improvements as shown on the Watchtower Architectural Site Plan, and Watchtower's affirmative, sworn representation that construction of the Watchtower Development would begin "as soon as" all necessary approvals could be obtained, thereby obligating Watchtower to pay Lorterdan the sum of $9,500,000 under Section 4(a) of the Consulting Agreement within ten (10) days thereof, together with interest at the legal rate from March 10, 2009, attorneys' fees, costs and disbursements;

    b.    Waived the alleged right claimed in the Notice of Sale to sell the Subject Property back to Lorterdan for the sum of $11,500,000;

    c.    Is judicially estopped from claiming in defense of this action that it had never determined to proceed with the Watchtower Development;

    d.    Breached Section 2.9 of the Repurchase Agreement by failing to submit the Rezoning Application to the Town for the rezoning of the Subject Property and, as a result, unlawfully rendered the approval of such rezoning by the Town impossible, thereby assuming liability to Lorterdan in the sum of $9,500,000 on that ground as well; and

    e.   Breached the covenant of good faith and fair dealing set forth in the Agreements and is thus liable to Lorterdan for the sum of $9,500,000 pursuant to the Agreements, with interest thereon;

2.  Directing entry by the Clerk of Judgment in favor of Lorterdan and against Watchtower in the amount of $9,500,000, together with New York statutory interest at the rate of Nine (9%) Percent from March 10, 2009 until paid, prevailing party attorneys' fees, costs, and disbursements;

3.  Dismissing all of Watchtower's Counterclaims with prejudice; and

4.  Awarding to Lorterdan such other, further, and different relief as the Court may deem just and proper.

ROBERT D. JACKSON

Sworn to before me this
___ day of September, 201_

_____
Notary Public

DAVID HOLLANDER
Notary Public New Jersey
My Commission Expires July 13, 2015