IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
WHITE PLAINS DIVISION

|  |  |
|---|---|
| LORTERDAN PROPERTIES AT RAMAPO I, L.L.C., <br><br> Plaintiff, <br><br> v. <br><br> WATCHTOWER BIBLE AND TRACT SOCIETY OF NEW YORK, INC., <br><br> Defendant. | Civil No: 11-CV-03656 (CS) (LMS) |

**AFFIDAVIT OF RICHARD D. MOAKE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF WATCHTOWER'S CROSS-MOTION FOR SUMMARY JUDGMENT**

STATE OF NEW YORK     )

COUNTY OF PUTNAM     )

RICHARD D. MOAKE, being duly sworn, deposes and states under oath the following:

1. I am familiar with the facts and circumstances of this action and I make this Affidavit from my own personal knowledge.

2. At all times relevant to this action, I was and still am an Associate General Counsel in the Legal Department of the Watchtower Bible and Tract Society of New York, Inc. (hereinafter "Watchtower").

3. During the second half of 2008 and through the closing on February 27, 2009, I represented Watchtower regarding the final negotiation and drafting of the Purchase and Sale Agreement (hereinafter "PSA"), Repurchase Agreement (hereinafter "RA"), and Consulting Agreement (hereinafter "CA") (hereinafter altogether the "transaction documents"),

1
Affidavit of Richard D. Moake

relating to the transfer of title to the 248 acres of real estate which is the subject of this lawsuit (hereinafter the "Property") from Lorterdan Properties at Ramapo I, L.L.C. (hereinafter "Lorterdan") to Watchtower.

4. During that negotiation and drafting process, Lorterdan was represented at all times by Barry Mandelbaum and Craig W. Alexander, real estate attorneys at the Mandelbaum Salsburg Law Firm, a firm that held itself out, and continues to hold itself out, as experts in real estate law and real estate development. Exhibit "A" attached hereto is a copy of the website of that firm.

5. During the final negotiation and the preparation of the transaction documents and up to the date of the closing, I did not speak to or correspond directly with Robert Jackson; my direct communication regarding the terms of the transaction documents was done with either Mr. Mandelbaum, Mr. Alexander, or members of their law firm's staff. Drafts of the transaction documents were exchanged between and reviewed and edited by Mandelbaum Salsburg attorneys and me until both sides were satisfied that those documents clearly and unambiguously set forth the essential terms of the transaction.

6. On January 23, 2009, Watchtower and Lorterdan executed the PSA (Affidavit of Robert Jackson (hereinafter "Jackson"), Ex. 1) reciting a purchase price of $11,500,000, calling for the RA (Jackson, Ex. 3) and the CA (Jackson, Ex. 2) to be executed at the closing and incorporating the terms of the RA into the PSA.

7. For over ten years I have represented Watchtower and other corporations used by Jehovah's Witnesses in the United States and in other countries in the preparation of documents for the purchase of real estate that is intended to be developed for the purchaser's own use, and it is standard practice for Watchtower, and for such other corporations, to

      require that the Purchase and Sale Agreement include an extended period of time between the execution of the contract and the closing. The purpose of such extended period is so that the purchaser can evaluate the property from geologic, construction, and other standpoints to determine its suitability for the intended project and whether the appropriate local authorities are willing to grant necessary zoning and/or land use approvals for construction and operation of such project.

8. Following such practice, by letter dated September 10, 2008, Watchtower presented Lorterdan with a letter of intent dated September 9, 2008, that proposed to purchase the Property under either of two alternative arrangements. (Exs. B and C hereto)

9. Rather than accept either alternative contained in the letter of intent, Lorterdan proposed that the closing take place within thirty (30) days of entering into a Purchase and Sale Agreement for a purchase price of $11,500,000 and a requirement that Lorterdan would repurchase the Property from Watchtower for $11,500,000, if Watchtower determined for any reason within two (2) years after the closing that it would not proceed with the development of the Property; Lorterdan's proposal also included a provision by which, if Watchtower determined to proceed with the development of the Property, then Lorterdan would be paid an additional $9,500,000 by Watchtower as a "consulting fee." Although this was ostensibly payment for Lorterdan's assistance in obtaining all necessary approvals for the Watchtower development, including a zoning amendment to allow for that development, such arrangement was Lorterdan's way of obtaining the total compensation that it wanted for the Property in the event that Watchtower determined to proceed with its development of the Property.

10. In the instance of this transaction, Lorterdan wanted to close within thirty (30) days after signing the PSA. So, to protect Watchtower's interests, it was agreed that, by means of the RA, Watchtower would have a period of two (2) years after the closing during which it could make a determination of whether it would proceed with its intended development of the Property.

11. The closing took place on February 27, 2009, with Watchtower paying Lorterdan $11,500,000 and Lorterdan transferring title to the Property to Watchtower by Warranty Deed. (Jackson, Ex. 5)

12. At the closing, Lorterdan signed New York State transfer tax documents for filing with the State stating that the full purchase price was $11,500,000 (Ex. D hereto), and Lorterdan directed the title company to pay the transfer tax due on that purchase price, as indicated in the closing statement. (Ex. P hereto)

13. At the closing, in addition to signing the RA, Lorterdan and Watchtower executed the CA, which included the following statement: "**WHEREAS**, Watchtower intends to develop the Property as a complex of offices, residences, and ancillary uses similar to Watchtower's facilities at Patterson, New York and Wallkill, New York (the "Development")." (Jackson, Ex. 2)

14. The CA stated that, if within the two year period Watchtower determined to proceed with the Development, as defined in the transaction documents, then it would give Lorterdan written notice of that determination and pay Lorterdan a consulting fee of $9,500,000.

15. However, both the CA and the RA stated that, if for any reason within two (2) years after the closing, Watchtower determined to not proceed with the Development, as defined in the transaction documents, then Watchtower would have the right to give Lorterdan writ-

ten notice of that determination, and Lorterdan would then be obligated to repurchase the Property from Watchtower for $11,500,000 within six (6) months after receiving that written notice.  (Jackson, Ex. 2 ¶ 6; Jackson, Ex. 3 ¶ 2).

16. Pursuant to the RA, if Lorterdan failed to repurchase the Property within the time allowed, it would be deemed to be in breach of contract and Watchtower would be entitled to pursue any legal remedy it may have against Lorterdan, including recovery of legal fees.  (Jackson, Ex. 3 ¶¶ 2, 7)

17. At the time of the closing on the Property with Lorterdan, Watchtower, a not-for-profit religious corporation, had the intent to develop the Property as a complex of offices, residences, and ancillary uses similar to Watchtower's facilities at Patterson, New York, and Wallkill, New York (hereafter the "Development"), for its religious use and purposes, which would have entitled Watchtower to a real estate tax exemption under New York State Real Property Tax Law Section 420 for the tax year 2009/2010.  Under New York law, Watchtower would have to file an application for tax exemption each year and satisfy the Town that it either was using or still intended to use the Property for its religious purposes.  This requirement is in recognition of the fact that, like any other exempt property owner, Watchtower's use or intended use could change from year to year.

18. On February 27, 2009, the same day as the closing, Watchtower filed an application for tax exemption for the Property for the tax year 2009/2010.  (Jackson, Ex. 5)

19. That application described the religious uses that Watchtower intended for the Property at that time.

20. The tax exemption application for the tax year 2009/2010 was denied by the Town on May 1, 2009 (Jackson, Ex. 17, Ex. H thereto), and the grievance filed by Watchtower of

that denial to the Town Board of Assessment Review (Jackson, Ex. 17, Ex. J-1 thereto) was denied in June 2009.  (Jackson, Ex. 17, Ex. N thereto)

21. Following those denials, Watchtower filed a Petition in the Supreme Court, Rockland County, against the Town and its Board of Assessment Review.  (Jackson, Ex. 17)

22. The Petition contained a description of the religious use for which the Property was planned in furtherance of the religious purposes of Petitioner, expressing Watchtower's intent at the time.  (Jackson, Ex. 17 ¶ 14)

23. That litigation was eventually settled when Watchtower and the Town entered into a Stipulation (Jackson, Ex. 22), which was adopted as an Order by the Court.  (Jackson, Ex. 23)

24. Watchtower and the Town also entered into a Community Benefit Agreement (hereinafter "CBA") in settling that litigation (Jackson, Ex. 19), and subsequently the Property was declared by the Town to be tax exempt for the tax year 2009/2010.  (Jackson, Ex. 24)

25. The CBA specifically acknowledged that Watchtower, as a religious organization owning real property, would be entitled to tax exemption for the Property in future years if initial land use approvals were obtained from the Town and "if Watchtower continues to pursue its intended use of the Property in good faith."  (Jackson, Ex. 19, p. 2)

26. Clearly, the tax exemption for the Property was contingent on Watchtower continuing to have the intent to develop the Property.  In fact, the CBA required Watchtower to file for tax exemption each year so that the Town could re-examine whether Watchtower's use or intent to use had changed.  (Jackson, Ex. 19 ¶ 5)

27. If Watchtower's intent had changed in any given year, and if Watchtower no longer intended to develop the Property for exempt religious purposes, then the Property would lose its tax exempt status for that year and return to the Town's tax rolls.

28. Since it was obvious to all concerned that Watchtower's intent and plans for the Property could change, the CBA also provided that the community benefit donation for any given tax year would be reduced by the amount of any taxes paid by Watchtower. (Jackson, Ex. 19 ¶ 2)

29. Since Watchtower still intended to develop the Property, on February 25, 2010, Watchtower applied for tax exempt status for the Property for the tax year 2010/2011 (Jackson, Ex. 25). That application was granted on May 1, 2010. (Jackson, Ex. 26)

30. On October 7, 2010, Watchtower decided that it would not proceed with the Development, as defined in the transaction documents. (Ex. E hereto)

31. By letter dated November 1, 2010, Watchtower notified Lorterdan that Watchtower had determined not to proceed with the Development, as defined in the transaction documents, and that Lorterdan was contractually required to repurchase the Property. (Jackson, Ex. 4)

32. I was informed by Daniel Rice and Robert Pollock of Watchtower that they hand-delivered the November 1, 2010, letter to Robert Jackson of Lorterdan and that Mr. Jackson said Lorterdan would try to arrange for financing to repurchase the Property from Watchtower.

33. Although both the PSA and RA provide that any notices are to be served on Philip Brumley, Watchtower's General Counsel, at the address where his and my offices are located, neither Mr. Brumley nor I nor anyone else at our offices received from Lorterdan a de-

mand for payment of the $9,500,000 "consulting fee" at any time before November 1, 2010; no person at Watchtower has indicated to me that he received such a demand from Lorterdan before that date; Lorterdan has not asserted that it made such a demand to Watchtower before such date; and, based on my conversations with Robert Pollock and Daniel Rice, Mr. Jackson did not demand payment of the consulting fee when he was notified of Watchtower's demand to repurchase on November 1, 2010.

34. Since the deadline for filing for tax exemption for the Property was approaching and Lorterdan had still not repurchased the Property from Watchtower, Watchtower filed for tax exemption for the tax year 2011/2012 on February 25, 2011. (Jackson, Ex. 27)

35. In that application for tax exemption for the year 2011/2012, Watchtower disclosed to the Town that it had "suspended its plans to develop the property." (Jackson, Ex. 27 ¶ 2f and explanation of ¶ 2f on p. 2) Thus, the Town was aware that Watchtower's intent had changed.

36. In an e-mail message to your affiant dated March 1, 2011, Judith A. Procopio, an attorney representing Lorterdan at the time wrote: "Lorterdan is making a petition to the Town Board (Ramapo) to change the zoning code so that they can develop the property without the age restriction." Along with that message, Ms. Procopio submitted a proposed Owner's Consent Affidavit for Watchtower to sign and a copy of the "final" Petition; among other things, the Petition stated that "The Petitioner [Lorterdan Properties at Ramapo I, L.L.C] is the contract purchaser of real property situated in the Town of Ramapo, County of Rockland, and State of New York, consisting of approximately 249.1 acres, more particularly known and designated on the Tax Map of the Town of Ramapo as tax parcels numbered 38.14-1-1 and 38.10-1-3," which is the Property subject to this litigation;

among other things, the Petition states: "Petitioner respectfully suggests that a failure to allow for age-targeted ownership and three bedroom units is an unreasonable and arbitrary limitation on Petitioner's ability to develop its property in a manner that is consistent with the Town's Zoning Law and the RSH District."  (The Petition is attached hereto as Ex. F)

37. To respond to this request, Watchtower provided an Owner's Consent Affidavit.  That affidavit informed the Town that Lorterdan "has a contract right and obligation to purchase the Property."  (Ex. G hereto)

38. By letter dated March 28, 2011, Lorterdan's real estate attorney, Barry Mandelbaum, stated his understanding of the parties' agreements that the consulting fee was not due and owing to Lorterdan until re-zoning of the Property, but he demanded that Watchtower pay the consulting fee to Lorterdan; this letter is the first demand ever received from Lorterdan for payment of the consulting fee and, though self-serving and contrary to the wording of the transaction and the understanding of the parties with respect to whether and when the consulting fee was to be paid, it clearly reflects the fact that the parties understood that Watchtower's mere intent to develop the Property was not sufficient to trigger payment of the consulting fee.  (Ex. H hereto)

39. Thereafter, Watchtower received notice from the Town of a hearing scheduled for April 5, 2011, to discuss Lorterdan's petition to re-zone the Property.  (Ex. I hereto)

40. Watchtower's application for tax exemption for the tax year 2011/2012 was denied by the Town on April 20, 2011 (Ex. J hereto), and your affiant spoke to the Town Assessor, Scott Shedler, about that denial on April 26, 2011.

41. During that April 26, 2011, telephone conversation, Mr. Shedler informed your affiant that the application had been denied because Watchtower had suspended its plans to develop the Property and that Watchtower no longer has the intent to use the Property for exempt purposes. He also informed me that another party (Lorterdan) had applied to rezone the Property. (Ex. Q hereto)

42. By letter dated April 28, 2011, the Town notified Watchtower that the tax status of the Property had been changed from wholly exempt to taxable. (Ex. K hereto)

43. On April 29, 2011, your affiant received a telephone call and an e-mail message from Mr. Mandelbaum on behalf of Lorterdan: by telephone he asked for an extension of time for Lorterdan to work out the rezoning of the Property without having to pay an extension fee as required by the RA; and he stated in a subsequent e-mail message that if given the extension to obtain the rezoning, Lorterdan would return the original purchase price and may be willing to pay any real estate taxes Watchtower might have to pay in the meantime and pay "some consideration for the extension." (Ex. L hereto)

44. On June 3, 2011, your affiant spoke by telephone to Michael Klein, the Town Attorney, and Alan Berman, the Assistant Town Attorney about the denial of the tax exemption application. During that conversation, they requested further information about the future use of the Property and the status of the repurchase of the Property by Lorterdan, stating that the Board of Assessment Review would be sending a written demand for information, which demand was subsequently received by Watchtower on June 7, 2011. (Ex. M hereto)

45. By letter dated June 9, 2011, your affiant notified the Town that Watchtower had terminated Lorterdan's contract interest in the Property and that litigation was pending be-

tween Watchtower and Lorterdan about the Property. Watchtower also confirmed again for the Town that Watchtower had suspended its original plans to develop the Property with residences and offices. (Ex. N hereto)

46. By letter dated May 5, 2011, on behalf of Watchtower, your affiant advised Lorterdan that Lorterdan was in breach of the RA and that Watchtower elected to terminate the RA; both before and after that letter, Lorterdan refused and continues to refuse to repurchase the Property from Watchtower and to pay Watchtower $11,500,000. (Ex. O hereto)

47. During March, 2011, Lorterdan petitioned the Town for a change in the zoning definition of the Property to remove the age restriction on Lorterdan's previously approved site plan for 292 residential units.

48. Such petition, in support of which Watchtower provided an Owner's Consent Affidavit, reflected both Lorterdan's understanding of its contractual obligation to repurchase the Property from Watchtower and Lorterdan's desire to make the Property easier to sell after Lorterdan repurchased it from Watchtower.

49. It is undisputed that, based upon the transaction documents, within two (2) years after the closing Watchtower had the right to determine for any reason that it would not proceed with its intended development of the Property, as defined in the transaction documents, and to compel Lorterdan to repurchase the Property at a price of $11,500,000.

50. It is undisputed that Watchtower gave Lorterdan written notice of its determination to not proceed with its development of the Property, as defined in the transaction documents, within two (2) years after the closing and demanded that Lorterdan repurchase the Property.

51. It is undisputed that Lorterdan has refused and continues to refuse to repurchase the Property from Watchtower.

52. It is clear that Lorterdan has failed to live up to its obligations under the transaction documents and is in breach of the Repurchase Agreement.

53. Under these circumstances, it is respectfully submitted that Lorterdan is not entitled to summary judgment in its favor.

54. Since the transaction documents clearly and unambiguously state that Watchtower is entitled to compel Lorterdan to repurchase the Property, it is respectfully submitted that Watchtower is entitled to judgment on the pleadings on its cross-motion in this case.

55. Alternatively, it is respectfully submitted that Watchtower is entitled to summary judgment in its favor on its cross-motion, since the additional documents beyond the transaction documents also clearly show that Watchtower never determined to proceed with its intended development of the Property and that Watchtower has the right to compel Lorterdan to repurchase the Property.

WHEREFORE, it is respectfully requested that this Court deny the motion for summary judgment by Lorterdan in its entirety and grant Watchtower's cross-motion for judgment on the pleadings.  In the alternative, it is respectfully requested that this Court grant Watchtower's cross-motion to the extent of granting summary judgment in its favor and on its counterclaims against Lorterdan and direct the Clerk of the Court to enter a  judgment declaring the following:

1. That Lorterdan did breach its contractual obligation to repurchase the Property from Watchtower;

2. That Watchtower is the rightful owner of the Property, or alternatively, directing Lorterdan to repurchase the Property from Watchtower at the price of $11,500,000, together

with nine percent (9%) interest from May 1, 2011, when Lorterdan was obligated to re-purchase the Property, costs and attorney's fees;

3. That all of Lorterdan's claims in this action against Watchtower are dismissed and that Lorterdan has no right or interest in or claim to the Property;

4. That Lorterdan is not entitled to any payment from Watchtower for the Property;

5. That the lis pendens filed by Lorterdan against the Property is null and void and of no further effect and are to be removed by the Clerks of Rockland and Orange County;

Together with such other and further relief as this Court may deem just and proper.

Dated: October 14, 2011.

*Richard D. Moake*
Richard D. Moake

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF PUTNAM     )

SUBSCRIBED AND SWORN TO BEFORE ME on the 14th day of October, 2011, by Richard D. Moake.

*Mark J. Bloedorn*
Notary Public, State of New York

MARK J. BLOEDORN
Notary Public, State of New York
No. 01BL6124975
Qualified in Kings County + Putnam
Commission Expires 04/04/20 13

13
Affidavit of Richard D. Moake