IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
WHITE PLAINS DIVISION

| | |
|---|---|
| LORTERDAN PROPERTIES AT RAMAPO I, L.L.C., <br><br> Plaintiff, <br><br> v. <br><br> WATCHTOWER BIBLE AND TRACT SOCIETY OF NEW YORK, INC., <br><br> Defendant. | Civil No.: 11-Cv-03656 (CS) (LMS) |

**AFFIDAVIT OF DANIEL RICE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF WATCHTOWER'S CROSS-MOTION FOR SUMMARY JUDGMENT**

STATE OF NEW YORK   )

COUNTY OF ULSTER   )

DANIEL RICE, being duly sworn, deposes and states under oath the following:

1. I am familiar with the facts and circumstances relating to this action, and I make this Affidavit from my own personal knowledge.

2. For the last 16 years, and at all times relevant to this case, I worked in the Real Property Department of Watchtower Bible and Tract Society of New York, Inc. (hereinafter "Watchtower"). In addition, I was chairman of the committee that represented Watchtower during its negotiations and purchase of the approximately 249-acre Lorterdan Property at Ramapo (hereinafter "the Property"), which real estate in Ramapo, New York, is the subject of this lawsuit.

3. Watchtower was first introduced to the Property and to Robert Jackson, a member of Lor-

terdan Properties at Ramapo I, L.L.C. (hereinafter "Lorterdan") and Lorterdan's principal agent with respect to selling the Property, in June of 2008 by real estate broker, David Gold.

4. Mr. Gold and then Mr. Jackson both informed me that Lorterdan had been trying to sell the Property for many years before 2008.

5. After the initial introduction to the Property and to Robert Jackson by Mr. Gold, Robert Jackson alone represented Lorterdan during all of the discussions that led up to the February 27, 2009, purchase of the Property by Watchtower. On behalf of Lorterdan, he negotiated the general terms of the purchase/sale.

6. I was informed by Mr. Gold and Mr. Jackson that Lorterdan owed approximately $14,500,000 on the Property.

7. In late 2008 or early 2009, I was further informed by Mr. Jackson that the bank to which Lorterdan owed the money had been convinced by Lorterdan to accept $10,000,000 in full satisfaction of Lorterdan's outstanding debt but that the sale of the Property had to take place quickly. Exhibit "A" attached hereto is a copy of the letter from counsel for TD Bank agreeing to accept $10,000,000 in payment of Lorterdan's debt.

8. Watchtower wanted to purchase the Property with the intention to develop it for Watchtower's own use. It never intended to purchase the property as an investment, or to develop it in accordance with Lorterdan's planned development.

9. Watchtower's usual practice when purchasing real property is to enter into a purchase and sale agreement in which the seller agrees to an extended period of time during which Watchtower is entitled to make a determination whether to actually proceed with the development of that property. This includes deciding whether the property suits the pur-

poses of Watchtower from geologic, construction, and other standpoints and whether the appropriate local authorities are willing to grant necessary zoning and/or land use approvals for Watchtower's intended use. For this reason, Watchtower normally insists on an extended period of time between entering into a purchase and sale agreement and the actual closing of the transaction.

10. Following such practice, by letter dated September 10, 2008, Watchtower presented Lorterdan with a letter of intent dated September 9, 2008, that proposed to purchase the Property under either of two alternative arrangements. (Affidavit of Richard D. Moake (hereinafter "Moake"), Exs. B and C)

11. In order to avoid the extended period of time before closing under either alternative proposed by Watchtower, and because he indicated that his bank was pressing him for its money, Mr. Jackson proposed that the closing take place immediately, within thirty (30) days of entering into the Purchase and Sale Agreement, for a purchase price of $11,500,000, and that Watchtower could have two (2) years to perform its due diligence.

12. To induce Watchtower to close on the sale quickly, Mr. Jackson also proposed that the Purchase and Sale Agreement include a requirement that Lorterdan would repurchase the property from Watchtower for the full purchase price of $11,500,000, if Watchtower determined for any reason within two (2) years after the closing that it would not proceed with its development of the Property and gave Lorterdan written notice of that determination.

13. Mr. Jackson also proposed that the Purchase and Sale Agreement include a provision by which, if Watchtower determined to proceed with the development of the Property, then Lorterdan would be paid an additional $9,500,000 by Watchtower as a "consulting fee."

Although this was ostensibly payment for Lorterdan's assistance in obtaining all necessary approvals for the Watchtower development, including a zoning amendment to allow for that development, such arrangement was Lorterdan's way of obtaining the total compensation that it wanted for the Property in the event that Watchtower determined to proceed with its development of the Property.

14. Negotiation of the exact contract terms of the sale/purchase was then undertaken by Richard Moake of the Watchtower Legal Department and the law firm of Mandelbaum Salsburg representing the interests of Lorterdan.

15. During early February 2009, before the closing and while Lorterdan still owned the property, Mr. Jackson was aware of and assisted with Watchtower's submission to the Town of Ramapo (hereinafter "the Town") of initial proposals for discussion relating to Watchtower's possible development of the property. (Affidavit of Robert Jackson (hereinafter "Jackson"), Exs. 7-9)

16. During early February 2009, before the closing and while Lorterdan still owned the Property, Mr. Jackson provided an Owner's Consent Affidavit to Watchtower for submission to the Town to assist in the discussion of Watchtower's proposed development of the property. (Jackson, Exhibit 7)

17. With Lorterdan's knowledge, permission, consent and assistance, in early February 2009, before the closing and while Lorterdan still owned the Property, Watchtower submitted a SEQR Short Environmental Assessment Form (Jackson, Ex. 8), as well as a "Narrative" of the proposed Watchtower development (Jackson, Ex. 9), attaching an architectural site plan, a water flow diagram and an electrical diagram, among other things.

18. Mr. Jackson personally attended meetings with the Town before and after the Febru-

ary 27, 2009, closing to discuss Watchtower's proposed development of the property.

19. Both before and after the closing, Lorterdan was aware of and assisted Watchtower with ongoing meetings with the Town and submissions to revise Watchtower's proposals.

20. The closing took place on February 27, 2009, and at the closing pursuant to the Purchase and Sale Agreement, Lorterdan and Watchtower entered into the Consulting Agreement (Jackson, Ex. 2) and the Repurchase Agreement (Jackson, Ex. 3), giving Watchtower the agreed-upon two (2) years to decide whether to proceed with its intended development of the Property and obligating Lorterdan to repurchase the Property, if Watchtower decided for any reason not to proceed with such development.

21. Prior to and as of the closing on February 27, 2009, Lorterdan understood and acknowledged that Watchtower was purchasing the Property with general intent of developing it as a "complex of offices, residences, and ancillary uses similar to Watchtower's facilities at Patterson, New York and Wallkill, New York," but that Watchtower had the right to require Lorterdan to repurchase the Property within two years if Watchtower determined "for any reason that it will not proceed" with such development, as stated in the Consulting Agreement. (Jackson, Ex. 2)

22. On December 30, 2009, some 10 months after the closing, and while Lorterdan was aware of all of Watchtower's dealings and discussions with the Town, Mr. Jackson asked Watchtower to provide an Owner's Consent Affidavit (Pollock, Ex. A) in order to preserve Lorterdan's previously granted site plan approval to build 292 age-restricted units for sale.

23. Lorterdan knew that Watchtower did not intend to build age-restricted units on the Property; Lorterdan asked for this assistance from Watchtower because Lorterdan did not

want to lose the ability to develop the Property as it had previously planned, in the event that Watchtower were to determine not to proceed with its intended development of the Property, thus requiring Lorterdan to repurchase the Property.

24. At no time did Watchtower ever determine to proceed with its intended development of the Property.

25. At no time did Watchtower ever give Lorterdan written notice of a determination to proceed with its intended development of the Property.

26. On October 7, 2010, Watchtower decided to discontinue all planning and permitting work on the Property and exercise its right to compel Lorterdan to repurchase the Property. (Moake, Ex. E)

27. On November 1, 2010, Robert Pollock of Watchtower's Design/Build Department and I met with Robert Jackson and hand-delivered to him a letter providing notice of Watchtower's determination not to proceed with its intended development of the Property. (Jackson, Ex. 4)

28. That November 1, 2010, letter demanded that Lorterdan repurchase the Property in accordance with the terms of our agreements.

29. During that November 1, 2010, meeting with Mr. Jackson, he *did not* in any way indicate that the $9,500,000 consulting fee was due or demand that it be paid.

30. During that November 1, 2010, meeting with Mr. Jackson, he *did* indicate that he would start making financial arrangements to repurchase the Property.

31. Further, at no time prior to November 1, 2010, did Mr. Jackson, or anyone else on behalf of Lorterdan, make a request in writing or orally to any Watchtower representative that Watchtower pay Lorterdan the consulting fee, or indicate in any fashion to any Watch-

tower representative that the consulting fee was due and owing from Watchtower to Lorterdan.

32. At all times during the period of February 27, 2009 (the closing date), through October 7, 2010 (the date the decision was made to return the Property), Watchtower both possessed a good faith intent to develop the Property and proceeded in good faith with its evaluation and planning work on that Property.

33. During early 2011, Mr. Jackson informed the Town that Lorterdan was going to regain possession and control of the Property and that Lorterdan would seek a zoning amendment to remove the age restriction on Lorterdan's previously obtained site plan approval for the building of 292 residential units. This would expand the potential market for the residential units, making it easier for Lorterdan to sell the Property to a developer or individual units to purchasers following Lorterdan's repurchase from Watchtower. (Moake, Ex. F)

34. In order to assist Lorterdan, Watchtower gave Lorterdan an Owner's Consent Affidavit on March 14, 2011, allowing Lorterdan to seek a zoning amendment from the Town. (Moake, Ex. G)

35. Based upon my discussions with Mr. Jackson and the terms of the agreements between Lorterdan and Watchtower, it is clear that Lorterdan understood and agreed that, within two (2) years after the closing, Watchtower had the right to give Lorterdan written notice of Watchtower's determination if for any reason Watchtower would not proceed with its intended development of the Property and to compel Lorterdan to repurchase the Property at a price of $11,500,000, thus giving Watchtower a two (2) year due diligence period; in fact, this arrangement was what Lorterdan proposed to Watchtower.

36. It is undisputed that Watchtower gave Lorterdan written notice of its determination to not proceed with the development of the Property within two (2) years after the closing and demanded that Lorterdan repurchase the Property.

37. It is undisputed that Lorterdan has refused and continues to refuse to repurchase the Property from Watchtower.

38. It is clear that Lorterdan has failed to live up to its obligations under the agreements between it and Watchtower and is in breach of those agreements.

39. Since the agreements clearly and unambiguously state that Watchtower is entitled to compel Lorterdan to repurchase the property, it is respectfully submitted that Watchtower is entitled to judgment on the pleadings on its cross-motion in this case.

40. Alternatively, it is respectfully submitted that Watchtower is entitled to summary judgment in its favor on its cross-motion, since the additional documents beyond the agreements also clearly show that Watchtower never determined to proceed with its intended development of the Property and that Watchtower has the right to compel Lorterdan to repurchase the Property.

WHEREFORE, it is respectfully requested that this Court deny the motion for summary judgment by Lorterdan in its entirety and grant Watchtower's cross-motion for judgment on the pleadings. In the alternative, it is respectfully requested that this Court grant Watchtower's cross-motion to the extent of granting summary judgment in its favor and on its counterclaims against Lorterdan and direct the Clerk of the Court to enter a judgment declaring the following:

1. That Lorterdan did breach its contractual obligation to repurchase the Property from Watchtower;

2. That Watchtower is the rightful owner of the Property, or alternatively, directing Lorter-

…

dan to repurchase the Property from Watchtower at the price of $11,500,000, together with nine percent (9%) interest from May 1, 2011, when Lorterdan was obligated to repurchase the Property, costs and attorney's fees;

3. That all of Lorterdan's claims in this action against Watchtower are dismissed and that Lorterdan has no right or interest in or claim to the Property;

4. That Lorterdan is not entitled to any payment from Watchtower for the Property;

5. That the lis pendens filed by Lorterdan against the Property is null and void and of no further effect and are to be removed by the Clerks of Rockland and Orange County;

Together with such other and further relief as this Court may deem just and proper.

Dated: October 14, 2011.

_____
Daniel Rice

STATE OF NEW YORK   )
                    ) ss.:
COUNTY OF ULSTER    )

SUBSCRIBED AND SWORN TO BEFORE ME on the 14th day of October, 2011, by Daniel Rice.

_____
Notary Public, State of New York

TOMAS CRESPO, JR.
Notary Public, State of New York
No. 01CR6208217
Qualified in Ulster County
Commission Expires 06/22/2013

9
Affidavit of Daniel Rice