UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

LORTERDAN PROPERTIES AT RAMAPO I,
LLC,

                Plaintiff,

       -against-

WATCHTOWER BIBLE AND TRACT SOCIETY
OF NEW YORK, INC.,

              Defendant.
-------------------------------------------------------------------x

**OPINION AND ORDER**

No. 11-CV-3656 (CS)

Appearances:
Joshua Grauer
Jordan Brooks
Cuddy & Feder LLP
White Plains, New York
*Counsel for Plaintiff*

Francis McNamara
Calvin Rouse
Legal Department
Watchtower Bible and Tract Society of New York, Inc.
Patterson, New York
*Counsel for Defendant*

Seibel, J.

      Before the Court are Plaintiff's Motion for Summary Judgment, (Doc. 15); Defendant's

Motion for Judgment on the Pleadings, (Doc. 20); and Defendant's Cross-Motion for Summary

Judgment, (Doc. 20).  For the reasons discussed below, Plaintiff's Motion is GRANTED IN

PART and DENIED IN PART, Defendant's Motion for Judgment on the Pleadings is

GRANTED IN PART and DENIED IN PART, and Defendant's Cross-Motion for Summary

Judgment is DENIED.

## I.  **Background**

### A.    Factual Background

The following facts are undisputed unless otherwise noted.

Plaintiff, Lorterdan Properties at Ramapo I, LLC ("Lorterdan"), is a New Jersey limited liability company, and Defendant, Watchtower Bible and Tract Society of New York, Inc. ("Watchtower"), is a New York not-for-profit corporation formed in 1909. (D's Reply 56.1 ¶¶ 1-2.)[1] According to the Amended Complaint ("AC"), Defendant "is the recognized legal organization in use by Jehovah's Witnesses." (AC ¶ 3.)[2] On January 23, 2009, the parties entered into a Purchase and Sale Agreement (the "PSA") for the sale of 248 acres of real property (the "Property") located primarily in the Town of Ramapo, New York (the "Town"). (D's Reply 56.1 ¶ 3.) The transaction closed on February 27, 2009. (*Id.* ¶ 4.) Defendant purchased the Property from Plaintiff for the purpose of developing a "complex of offices, residences, and ancillary uses similar to Watchtower's facilities at Patterson, New York and Wallkill, New York." (*Id.* ¶ 9 (internal quotation marks omitted).) More specifically, the Property was to be used as the "headquarters of Jehovah's Witnesses, the center for creating and writing Jehovah's Witnesses' religious literature, and the administrative center for the

---

[1] "D's Reply 56.1" refers to Defendant Watchtower Bible and Tract Society of New York, Inc.'s Corrected Opposition to Plaintiff's Statement of Material Facts. (Doc. 24.) In this document, Defendant failed to adhere to Federal Rule of Civil Procedure 56(c) and Local Rule 56.1(d) in that it did not cite to admissible evidence in support of its statements denying Plaintiff's statements of material fact. Accordingly, where there is a relevant conflict, Plaintiff's statements will be deemed admitted. *See Guarino v. St. John Fisher Coll.*, 553 F. Supp. 2d 252, 253-54 (W.D.N.Y. 2008) (assertions in Rule 56.1 statement deemed admitted where Rule 56.1 counterstatement failed to cite to admissible evidence), *aff'd*, 321 F. App'x 55 (2d Cir. 2009) (summary order); *BOUSA Inc. v. United States (In re Bulk Oil (USA) Inc.)*, Nos. 89-B-13380, 93-CV-4492, 93-CV-4494, 2007 WL 1121739, at *15-16 (S.D.N.Y. Apr. 11, 2007) (deeming government's Rule 56.1 statement admitted because plaintiff failed to provide evidence supporting statements in Rule 56.1 counterstatement, noting that "failure to provide any citation at all will leave a factual allegation without evidentiary value"); *Cooper v. Gottlieb*, No. 95-CV-10543, 2000 WL 1277593, at *4 (S.D.N.Y. Sept. 8, 2000) (deeming fact asserted by defendant admitted where plaintiffs' Rule 56.1 counterstatement stated that they denied defendants' assertion but cited to and submitted no evidence supporting denial), *aff'd*, 12 F. App'x 28 (2d Cir. 2001) (summary order).

[2] "AC" refers to Plaintiff's Amended Verified Complaint. (Doc. 1.)

Worldwide Order of Special Full-Time Servants of Jehovah's Witnesses . . . whose members will provide the staff for and live at the facility." (*Id.* ¶ 23.)

1.    The Agreements

Three agreements governed the purchase of the Property: the PSA, a Repurchase Agreement ("RA"), and a Consulting Agreement ("CA") (collectively, the "Agreements"). (P's Reply 56.1 ¶ 17.)[3]

a.    The PSA

Pursuant to the PSA, Defendant purchased the Property from Plaintiff for $11.5 million. (McNamara Aff. Ex. 1-1 ¶ 3.1.)[4] At the time of closing, Defendant fulfilled this obligation and paid Plaintiff $11.5 million for the Property. (D's Reply 56.1 ¶ 5.) The PSA also explicitly required the parties to execute the RA and CA. (McNamara Aff. Ex. 1-1 ¶¶ 2.3, 12.1.) As such, the parties entered into the RA and CA on the date of the closing. (P's Reply 56.1 ¶¶ 28, 32.)

b.    The RA

Although the sale of the Property closed on February 27, 2009, the RA provided a two-year period (the "Two-Year Period") during which Plaintiff was obligated to repurchase the Property from Defendant for $11.5 million if Defendant determined not to proceed with its intended development of the Property (the "Development").[5] The RA provides, in relevant part:

---

[3] "P's Reply 56.1" refers to Plaintiff's Response to Defendant's Statement of Material Facts in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendant's Cross-Motion for Summary Judgment. (Doc. 32.)

[4] "McNamara Aff." refers to the Affidavit of Francis J. McNamara [in Support of] Watchtower Bible and Tract Society of New York, Inc.'s Motion for Judgment on the Pleadings. (Doc. 25.) Exhibit 1 to the McNamara Affidavit consists of the AC and several exhibits thereto numbered 1-16. The notation 1-1, therefore, refers to the first exhibit within Exhibit 1 of the McNamara Affidavit.

[5] Defendant asserts that the transaction was structured in this fashion because Defendant wanted a "long due diligence period" but "Plaintiff was unwilling to enter into such a purchase agreement" because it "need[ed] funds soon to pay off creditors." (Watchtower Bible and Tract Society of New York, Inc.'s Answer and Counterclaims

3

> 2. If before the end of two (2) years from the date of the Closing of Watchtower's purchase of the Property from Lorterdan . . . Watchtower determines for any reason that it will not proceed with its intended development of the Property as a complex of offices, residences, and ancillary uses similar to Watchtower's facilities at Patterson, New York and Wallkill, New York . . . , then Watchtower shall give Lorterdan written notice of its determination not to proceed, and Lorterdan shall repurchase the Property from Watchtower . . . for the price of Eleven Million Five Hundred Thousand Dollars ($11,500,000.00) . . . .

(McNamara Aff. Ex. 1-3 ¶ 2.) To invoke the repurchase rights described above, Defendant was

required to give Plaintiff written notice of its determination not to proceed with the Development

in accordance with Section 2.5 of the RA. (*See id.* ¶ 2.5.)

Defendant's repurchase rights under the RA could be forfeited in two ways. First,

Defendant's failure to give Plaintiff notice within the Two-Year Period of its determination not

to proceed with the Development would constitute a waiver of its right to have Plaintiff

repurchase the Property. As stated in the RA:

> 2.10. If Watchtower fails to give Lorterdan written notice of its determination not to proceed with its intended development of the Property within the 2-Year Period as set forth in Section 2, time being of the essence, Watchtower shall be deemed to have waived and forfeited its right to exercise its rights hereunder and to compel Lorterdan to repurchase the Property.

(*Id.* ¶ 2.10.) Second, if Defendant applied to have the Property rezoned[6] and the Town in fact

rezoned the Property during the Two-Year Period, such a rezoning would in effect preclude any

repurchase by Plaintiff, and Defendant would be required to pay Plaintiff the fee set forth in the

CA (discussed below). The RA provides:

> [I]f, within the 2-Year Period the Town of Ramapo rezones the Property pursuant

---

("Answer"), (Doc. 3), ¶ 23.) Specifically, Defendant contends that Plaintiff urgently needed $10 million to satisfy a debt to TD Bank on the Property. (P's Reply 56.1 ¶¶ 4-5.)

[6] At the time of closing, the Property was zoned for a subdivision comprising 292 units of age-restricted housing and was subject to full taxation. (D's Reply 56.1 ¶ 18.) Defendant's intended use of the Property required an amendment to the Town's zoning laws to permit, among other things, convents and monasteries on the Property. (*Id.* ¶ 61.)

to an application filed by Watchtower in furtherance of the Development, then Watchtower shall forthwith pay Lorterdan the Compensation as defined in the Consulting Agreement. This provision shall not prohibit Watchtower from filing and prosecuting applications for any approval required for the Development.

(*Id.* ¶ 2.9.)

c.    The CA

Pursuant to the CA, if Defendant determined to proceed with the Development, Defendant was required to pay Lorterdan an additional sum of $9.5 million as compensation for consulting services rendered by Plaintiff. The CA provides:

> 3. At all such times during the term of this Consulting Agreement as Watchtower shall reasonably require, Lorterdan shall provide consulting services and otherwise reasonably assist Watchtower to obtain the governmental approvals, entitlements, and permits . . . that are necessary for Watchtower to proceed with the Development; subject, however, to the provisions of Section 2.9 of the Repurchase Agreement.

> 4. If within the 2-Year Period Watchtower (a) determines that it will proceed with the Development, or (b) fails to exercise its rights under the Repurchase Agreement, then Watchtower shall pay Lorterdan Nine Million Five Hundred Thousand Dollars . . . as a fee for Lorterdan's consulting services and other assistance in assisting Watchtower to obtain the Approvals . . . . Such payment shall be made within ten (10) days of Watchtower giving Lorterdan written notice that Watchtower intends to proceed with the Development.

> ***

> 6. If for any reason before the end of the 2-Year Period Watchtower determines that it will not proceed with the Development and gives written notice of that determination to Lorterdan and exercises its rights under the Repurchase Agreement to compel Lorterdan to repurchase the Property in accordance with the terms of the Repurchase Agreement, then this Consulting Agreement shall automatically terminate, and Lorterdan shall not be entitled to the Compensation or any compensation.

(McNamara Aff. Ex. 1-2 ¶¶ 3-4, 6.)

In sum, taken together, the Agreements provide for the following:  Defendant would pay Plaintiff $11.5 million for the Property at the time of closing.  Defendant then had two years to

decide whether to proceed with the Development, during which time it could determine not to proceed and compel Plaintiff to repurchase the Property for $11.5 million. If Defendant did not exercise its repurchase rights within the Two-Year Period, it was obligated to pay Plaintiff an additional sum of $9.5 million in exchange for assistance in obtaining approvals and permits for development of the Property. Defendant would also be obligated to pay Plaintiff the $9.5 million consulting fee (the "Consulting Fee") if any of the following occurred during the Two-Year Period: (1) the Town approved a rezoning application submitted by Defendant, (*id.* Ex. 1-3 ¶ 2.9); (2) Defendant determined to proceed with its development of the Property, (*id.* Ex. 1-2 ¶ 4); (3) Defendant voluntarily opted to pre-pay the Consulting Fee, (*id.*); or (4) Defendant sold the Property to anyone other than Plaintiff, (*id.* ¶ 5).

> 2. Actions Taken by Defendant Toward Development of the Property
>
> a. Zoning Changes

On or around February 2, 2009, prior to the closing, Defendant submitted to the Town various documents concerning its potential development of the Property. (D's Reply 56.1 ¶¶ 24-25, 28.) For example, Defendant submitted to the Town Community Design Review Committee ("CDRC") a Notification Form requesting discussion on a potential amendment to the zoning ordinance, a Short Environmental Assessment Form, a narrative for Defendant's proposed use of the Property, an architectural site plan, a civil utilities plan, a fire/domestic water flow diagram, and an electrical system diagram. (D's Reply 56.1 ¶¶ 42-44, 47-48, 51, 53; Jackson Aff. Exs. 7-9;[7] P's Reply 56.1 ¶¶ 21, 24; Grauer Decl. Ex. B-9.[8]) Because Plaintiff still owned the Property

---

[7] "Jackson Aff." refers to the Affidavit of Robert D. Jackson in Support of Plaintiff's Motion for Summary Judgment Pursuant to Fed. R. Civ. P. Rule 56. (Doc. 15.)

[8] "Grauer Decl." refers to Attorney's [Joshua J. Grauer's] Declaration in Support of Plaintiff's Motion for Summary Judgment under Fed. R. Civ. P. Rule 56. (Doc. 16.) Exhibit B to the Grauer Decl. consists of the AC and several

at that time, Defendant obtained from Plaintiff an Owner's Consent Affidavit in support of the CDRC submission. (*See* Jackson Aff. Ex. 7.) On February 18, 2009, Defendant and its counsel attended a CDRC meeting at which the Development was discussed. (D's Reply 56.1 ¶ 57.) In late February or early March 2009, Defendant submitted a proposed zoning law amendment to the Town.[9] (*Id.* ¶ 58.) On March 2, 2009, Defendant received comments on the proposed amendment from the Deputy Town Attorney, (*id.* ¶ 59; Jackson Aff. Ex. 10), and on March 13, 2009, Defendant submitted a revised proposed zoning law amendment in anticipation of an upcoming CDRC meeting, (D's Reply 56.1 ¶ 61; Jackson Aff. Ex. 12). The Town forwarded the proposed zoning amendments to its planning and zoning consultants, Frederick P. Clark Associates, Inc., who, on March 24, 2009, provided a number of comments on the proposed amendments. (D's Reply 56.1 ¶ 63; Jackson Aff. Ex. 12.)

Defendant attended the CDRC meeting on March 24, 2009. At the meeting, the CDRC instructed Defendant to make further revisions to the zoning proposal and submit it to the Town Clerk for consideration by the Town Board, and also to submit a narrative on the issue of whether its intended Development would require an amendment to the Town's comprehensive plan. (D's Reply 56.1 ¶¶ 65-66; Jackson Aff. Ex. 13.) Defendant submitted a revised zoning proposal to the Town on or around April 14, 2009, (D's Reply 56.1 ¶ 66), and submitted the narrative to the Town CDRC on or around April 13, 2009, (*id.* ¶ 67). It appears, however, that Defendant never concluded the zoning application process because it never submitted a revised final zoning proposal to the Town Clerk for review by the Town Board. (*Id.* ¶ 168; Jackson Aff.

---

exhibits thereto numbered 1-16. The notation B-9, therefore, refers to the ninth exhibit within Exhibit B of the Grauer Decl.

[9] Plaintiff states that Defendant submitted a proposed "Rezoning Application," while Defendant contends that it submitted a "proposed amendment to the zoning text." (D's Reply 56.1 ¶ 58.)

¶¶ 101, 103.)  By letter dated December 20, 2009, Plaintiff asked Defendant for an Owner's

Consent Affidavit so that Plaintiff could renew the site plan approval that it had previously

obtained for the Property.  (P's Reply 56.1 ¶ 53.)

> b.   Tax Exemption

On February 27, 2009, the date of the closing, Defendant filed an application for tax

exemption for the Property (the "First TEA").[10]  (D's Reply 56.1 ¶ 20; Jackson Aff. Ex. 5.)  The

First TEA described the "intended uses" of the property, identified the financing sources for the

construction, stated that construction would begin "[a]s soon as necessary Town and other

approvals for the development are obtained," and appended an architectural site plan and other

documents previously filed with the Town.  (Jackson Aff. Ex. 5 ¶¶ 10, 14; D's Reply 56.1 ¶¶ 29-

30; P's Reply 56.1 ¶ 36.)  On May 1, 2009, the application was denied by the tax assessor.  (*See*

D's Reply 56.1 ¶ 71; Jackson Aff. Ex. 30.)  On May 26, 2009, Defendant appealed this decision

to the Town's Board of Assessment Review (the "BAR"), (D's Reply 56.1 ¶ 72), which denied

Defendant's grievance on June 25 and 29, 2009, (*id.* ¶ 78).  On July 30, 2009, Defendant

commenced an action in New York Supreme Court against the Tax Assessor, BAR, and Town,

seeking reversal of the tax exemption denial.  (*Id.* ¶ 80.)  Defendant discontinued the lawsuit

after entering into a settlement agreement with the Town whereby the Property would receive tax

exempt status for 2009-2010, (*see id.* ¶¶ 118-19), in exchange for Defendant's promise to make

certain donations to the Town pursuant to a Community Benefit Agreement (the "CBA"), (P's

Reply 56.1 ¶ 44).  The CBA provided, among other things, that Defendant would pay the Town

$300,000 within fifteen days of the CBA's effective date, and $250,000 on September 1 in each

---

[10] Defendant admits that the application was filed on February 27, 2009, but states that certain documents referenced in the application were filed with Plaintiff's consent on February 2, 2009.  (D's Reply 56.1 ¶¶ 24-27.)

year from 2010-2013, less the amount of any taxes paid in a given year.[11] (Jackson Aff. Ex. 19 ¶ 1, at 2; D's Reply 56.1 ¶¶ 105, 108.) Under the CBA, Defendant remained obligated to renew its tax exemption each year, but if the Town denied tax exempt status for the Property in a subsequent year, Defendant had the right not to pay its CBA donation for that year. (Jackson Aff. Ex. 19 ¶ 5, at 3.) In addition, the CBA required Defendant to pay the Town up to $700,000 toward the purchase of a new fire truck after Defendant received all permits and approvals for the Development. (*Id.* ¶ 8, at 4; D's Reply 56.1 ¶ 113.) In accordance with the CBA, Defendant paid the Town $300,000 shortly after they entered into the CBA and $250,000 in September 2010. (D's Reply 56.1 ¶¶ 106, 110.)

By application dated February 25, 2010, Defendant filed for renewal of tax exempt status for the Property for 2010-2011 (the "Second TEA"); the application was granted on May 1, 2010. (P's Reply 56.1 ¶¶ 54-55; Jackson Aff. ¶ 25.) Similarly, on or about February 25, 2011, Defendant filed a renewal for tax exempt status for the year 2011-2012 (the "Third TEA," and collectively with the First and Second TEAs, the "TEAs"). (D's Reply 56.1 ¶ 139; Jackson Aff. Ex. 27.) Defendant indicated on the Third TEA that "a change ha[d] occurred in the nature or schedule of planned construction," but did not indicate that the Property was "now being offered for sale or lease," despite the fact that Defendant had already asked Plaintiff to repurchase the Property (as described below). (Jackson Aff. Ex. 27; D's Reply 56.1 ¶ 142.) The Third TEA was denied on April 20, 2011, and on April 28, 2011, Defendant appealed this denial to the BAR. (D's Reply 56.1 ¶¶ 156-57.)

Defendant avers that in March 2011, after the repurchase request described below,

---

[11] Defendant denies Plaintiff's statement that pursuant to the CBA, Defendant agreed to make these payments to the Town, but Defendant provides no explanation or citation establishing the basis for its denial. Accordingly, these facts are deemed admitted.

Plaintiff took steps toward petitioning for a zoning change to the Property so that Plaintiff could develop the Property. (P's Reply 56.1 ¶ 67; Moake Aff. Ex. F.[12]) In support of this process, Defendant provided Plaintiff with an Owner's Consent Affidavit dated March 14, 2011, authorizing the zoning petition and stating that Plaintiff had a contractual right in the property and an obligation to repurchase it from Defendant. (P's Reply 56.1 ¶ 68; Moake Aff. Ex. G.) On June 3, 2011, Richard Moake, an employee in Defendant's Legal Department, (Moake Aff. ¶ 2), spoke with the Town Attorney concerning the status of the Property, and around June 7, the Town sent Defendant a written demand for further information on the subject. (P's Reply 56.1 ¶¶ 79-80; Moake Aff. Ex. M.) By letter dated June 9, 2011, Defendant notified the Town that litigation concerning the Property was ongoing and described Defendant's intended use of the Property during the pending lawsuit. (P's Reply 56.1 ¶ 81; Moake Aff. Ex. N.)

3.   Repurchase Request

Defendant states that on or around October 7, 2010, it made the determination not to proceed with its intended development of the Property. (Moake Aff. ¶ 30.) By letter dated November 1, 2010, Defendant notified Plaintiff that it had determined not to proceed with the Development and stated that Plaintiff was required to repurchase the Property from Defendant. (D's Reply 56.1 ¶ 132; Jackson Aff. Ex. 4.) On November 1, 2010, Robert Jackson, the managing member of Plaintiff, (Jackson Aff. ¶ 1), met with Robert Pollock, an employee in Defendant's Design/Build Department and a member of the committee that represented

---

[12] "Moake Aff." refers to the Affidavit of Richard D. Moake in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Watchtower's Cross-Motion for Summary Judgment. (Doc. 26.) Before selling the Property to Defendant, Plaintiff had obtained approval for development of a community for those over age 55, but because of economic and demographic changes in the meantime, wished to have the age restriction lifted. (Moake Aff. Ex. F, at 1.)

Defendant during the purchase of the Property, (Pollock Aff. ¶ 2),[13] and Daniel Rice, an

employee in Defendant's Real Property Department, (Rice Aff. ¶ 2),[14] and indicated that he

would start to arrange financing for the repurchase of the Property, (P's Reply 56.1 ¶ 63).

By letter dated March 28, 2011, Plaintiff's counsel, Barry Mandelbaum, notified

Moake that Plaintiff was rejecting Defendant's repurchase demand and was instead

demanding that Defendant pay Plaintiff the $9.5 million Consulting Fee. (Moake Aff.

Ex. H.)

> B.    Procedural History

On May 10, 2011, Plaintiff filed a Complaint with the Rockland County Clerk, as well as

a Notice of Pendency with regard to the Property; the latter was subsequently filed with the

Orange County Clerk as well. (D's Reply 56.1 ¶¶ 170-72.) On May 17, 2011, Plaintiff amended

its Complaint, and on May 27, 2011, the action was removed to this Court. (*Id.* ¶¶ 173, 175; *see*

Doc. 1.) On June 3, 2011, Defendant filed its Answer and Counterclaims, and on June 10, 2011,

Plaintiff filed a Reply to the counterclaims. (D's Reply 56.1 ¶¶ 176-77; *see* Docs. 3, 6.) On

December 16, 2011, before any discovery had taken place, Plaintiff filed a Motion for Summary

Judgment and Defendant filed a Motion for Judgment on the Pleadings and a Cross-Motion for

Summary Judgment. (Docs. 15, 20.)

## II.    **Discussion**

Plaintiff alleges four primary causes of action:  breach of contract and breach of the

covenant of good faith and fair dealing for not applying for a rezoning of the Property, and

---

[13] "Pollock Aff." refers to the Affidavit of Robert Pollock, Jr. in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Watchtower's Cross-Motion for Summary Judgment. (Doc. 29.)

[14] "Rice Aff." refers to the Affidavit of Daniel Rice in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Watchtower's Cross-Motion for Summary Judgment. (Doc. 28.)

breach of contract and breach of the covenant of good faith and fair dealing for failing to pay the $9.5 million Consulting Fee. Plaintiff also pleads causes of action for a declaratory judgment stating that Defendant was obligated to pursue a rezoning of the Property and breached the Agreements by failing to do so, and specific performance or an injunction based on Defendant's failure to pursue a rezoning.

A.   Motion for Judgment on the Pleadings

1.   Legal Standard

The standard of review for a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure is the same as that for a Rule 12(b)(6) motion to dismiss. *See Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001); *Accelecare Wound Ctrs., Inc. v. Bank of N.Y.*, No. 08-CV-8351, 2009 WL 2460987, at *4 (S.D.N.Y. Aug. 11, 2009).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration, citations, and internal quotation marks omitted). While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of

discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

On a motion to dismiss, a court may "'consider documents attached to the complaint as an exhibit or incorporated in it by reference, matters of which judicial notice may be taken, or documents either in the plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.'" *Genna v. Sallie Mae, Inc.*, No. 11-CV-7371, 2012 WL 1339482, at *2 (S.D.N.Y. Apr. 17, 2012) (alterations omitted) (quoting *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).

2.    <u>Analysis</u>

a.    <u>Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing for Not Applying for a Rezoning of the Property</u>

Plaintiff alleges that Defendant breached the Agreements and the covenant of good faith and fair dealing by "failing to adhere to its contractual obligation to timely and continuously apply for [a] rezoning [of the Property] in good faith and with diligence, for the singular and very transparent purpose . . . of avoiding" payment of the $9.5 million Consulting Fee. (AC ¶ 204;

*see id.* ¶ 188.) Plaintiff seeks a declaratory judgment stating that Defendant was obligated to "pursue in good faith and with diligence, with the assistance of Plaintiff, [a] rezoning of the Property . . . and that by failing to do so, Defendant breached" the Agreements, (*id.* ¶ 178), as well as other remedies, including damages and specific performance or an injunction, (*id.* ¶¶ 200-32).

i.    Breach of Contract

To make out a *prima facie* case for breach of contract, "a plaintiff must plead and prove the existence of a contract, a breach of that contract, and damages resulting from the breach." *Genna*, 2012 WL 1339482, at *5.[15]

An examination of the AC and the attachments thereto makes clear that Plaintiff has not plausibly pleaded facts indicating that Defendant breached the Agreements by failing to apply for a rezoning of the Property. This is so because the Agreements do not create any obligation on the part of Defendant to "timely and continuously" apply for a rezoning of the Property before the end of the Two-Year Period. (*Id.* ¶ 204.) The only provision which could potentially create such an obligation is paragraph 2.9 of the RA which states:

> Watchtower covenants and agrees that if, within the 2-Year Period the Town of Ramapo rezones the Property pursuant to an application filed by Watchtower in furtherance of the Development, then Watchtower shall forthwith pay Lorterdan the Compensation as defined in the Consulting Agreement. This provision shall not prohibit Watchtower from filing and prosecuting applications for any approval required for the Development.

(McNamara Aff. Ex. 1-3 ¶ 2.9.) Nothing on the face of the Agreements purports to create any obligation to pursue a rezoning of the Property within the Two-Year Period. Rather, the plain language of the RA states only that *if* within the Two-Year Period the Property *is* rezoned, then

---

[15] In this diversity action, New York law, the law of the forum state, governs. *See Pfizer, Inc. v. Stryker Corp.*, 348 F. Supp. 2d 131, 142 n.63 (S.D.N.Y. 2004). There is no allegation that the law of another state would apply.

Defendant must pay Plaintiff the Consulting Fee. There is simply no language in this provision or in any other part of the Agreements indicating that Defendant had an obligation to pursue a rezoning, or that it could not begin that process and then change its mind. Indeed, the Agreements specifically contemplate that Defendant might decide not to proceed at all, so they cannot have required Defendant to follow through on rezoning under all circumstances. Furthermore, the last sentence of the same paragraph (RA ¶ 2.9), appears to support the same interpretation, as it contemplates that Defendant may pursue various development approvals without ultimately obtaining a rezoning.

Paragraph 2.9 of the RA appears to equate Defendant's obtaining a rezoning with a determination to proceed, in that both trigger Defendant's obligation to pay the $9.5 million and, presumably, extinguish Plaintiff's obligation to repurchase. Such a scenario makes sense, as it would protect Plaintiff from having to repurchase the Property after it had already been rezoned and then go to the trouble of pursuing a reversion back to the original zoning, (see D's Mem. 21), but it does not create an affirmative obligation on the part of Defendant. The language seems unambiguous, and in any event Plaintiff has not pleaded any facts that would render a different interpretation plausible.[16] Accordingly, because Defendant had no obligation to pursue a rezoning of the Property, Plaintiff's claim that Defendant breached the Agreements by not doing so is dismissed.

---

[16] Plaintiff appears to recognize the weakness of this claim. Only one and a half pages of Plaintiff's twenty-five page Memorandum of Law are devoted to a discussion of its rezoning claims. In fact, the Memorandum omits all discussion of the breach of contract rezoning claim and states only that Defendant breached the covenant of good faith and fair dealing by not applying for a rezoning of the Property. (See Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment ("P's Mem."), (Doc. 17), 23-25.) Accordingly, that claim is subject to dismissal as abandoned. See Apple v. Atl. Yards Dev. Co., LLC, No. 11-CV-5550, 2012 WL 2309028, at *8 (E.D.N.Y. June 18, 2012) (where defendants moved to dismiss breach of contract and unjust enrichment claims and "[p]laintiffs' opposition papers d[id] not address these aspects of the Defendants' motions," claims were "deemed abandoned and . . . dismissed"); Ret. Bd. of the Policemen's Annuity & Benefit Fund of Chi. v. Bank of N.Y. Mellon, No. 11-CV-5459, 2012 WL 1108533, at *8 (S.D.N.Y. Apr. 3, 2012) (where plaintiffs "offer[ed] no rejoinder" to defendant's argument, claim was dismissed with prejudice as abandoned).

ii.   Breach of the Covenant of Good Faith and Fair Dealing

Under New York law, "'[i]mplicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance.'" *Sheppard v. Manhattan Club Timeshare Ass'n, Inc.*, No. 11-CV-4362, 2012 WL 1890388, at *7 (S.D.N.Y. May 23, 2012) (quoting *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995)). A claim alleging a breach of this covenant will not stand, however, if it is duplicative of a breach of contract claim. *See Fleisher v. Phoenix Life Ins. Co.*, No. 11-CV-8405, 2012 WL 1538357, at *6 (S.D.N.Y. May 2, 2012) ("New York law does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled.") (alteration and internal quotation marks omitted); *4Kids Entm't, Inc. v. Upper Deck Co.*, 797 F. Supp. 2d 236, 241 (S.D.N.Y. 2011) (*sua sponte* dismissing plaintiff's good faith/fair dealing claims because "New York does not recognize a separate claim for breach of an implied covenant of good faith where a contract exists. Either the contract's terms were breached or they were not, and 'good faith and fair dealing' does not imply any obligation above and beyond the terms of the parties' actual agreement."). Even where the breach of contract claim is dismissed, the good faith/fair dealing claim will be dismissed if it is redundant. *See Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, No. 10-CV-4145, 2012 WL 1852409, at *14-15 (S.D.N.Y. May 17, 2012) (dismissing good faith/fair dealing claim because it was "identical" to dismissed breach of contract claim); *DeSilva v. N. Shore-Long Island Jewish Health Sys., Inc.*, No. 10-CV-1341, 2012 WL 748760, at *8 (E.D.N.Y. Mar. 7, 2012) (where plaintiffs failed to plead breach of contract, good faith/fair dealing claim based on same conduct could not survive).

Here, Plaintiff's claim for breach of the covenant of good faith and fair dealing is ripe for dismissal because it is essentially identical to the above breach of contract claim. Both claims

are premised on the same behavior – Defendant's failure to pursue a rezoning of the Property; there is no other conduct alleged that could possibly sustain a good faith/fair dealing claim.[17] Accordingly, this claim is dismissed.

### iii.    Declaratory Judgment

In the AC, Plaintiff seeks a declaratory judgment stating that Defendant was "obligated under [the Agreements] to pursue . . . [a] rezoning of the Property," and that Defendant "breached" the Agreements by failing to do so. In light of the above disposition, this claim is also dismissed. In addition, because this claim "seeks a declaration of the same rights as will be determined under [Plaintiff's] action for breach of contract," it is dismissed as duplicative of the above breach of contract claim. *Aeolus Down, Inc. v. Credit Suisse Int'l*, No. 10-CV-8293, 2011 WL 5570062, at *5 (S.D.N.Y. Nov. 16, 2011) (dismissing claim for declaratory relief as duplicative of breach of contract claim); *Summit Props. Int'l, LLC v. Ladies Prof'l Golf Ass'n*, No. 07-CV-10407, 2010 WL 2382405, at *6 (S.D.N.Y. June 14, 2010) ("[T]he Second Circuit has held that a declaratory judgment action should be entertained (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, or (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding. Where the declaratory judgment is duplicative of the breach of contract claim, neither of these purposes is served.") (internal quotation marks and citation omitted); *Bayerische Hypo-Und Vereinsbank AG v. AIG Matched Funding Corp.*, No. 09-CV-8386, 2010 WL 692873, at *1 (S.D.N.Y. Mar. 1, 2010) ("Plaintiffs' causes of action for declaratory judgment are duplicative of their breach of contract causes of action and are, thus, properly subject to

---

[17] While the contract may have contemplated Defendant's pursuit of a rezoning, Defendant's decision not to continue that pursuit cannot in any event be a breach of the covenant of good faith and fair dealing, because the contract also contemplated a decision by Defendant not to pursue a rezoning.

dismissal."); *Apple Records, Inc. v. Capitol Records, Inc.*, 529 N.Y.S.2d 279, 281 (1st Dep't 1988) ("A cause of action for a declaratory judgment is unnecessary and inappropriate when the plaintiff has an adequate, alternative remedy in another form of action, such as breach of contract.").

iv.   Specific Performance or Injunction

Plaintiff's request for specific performance or an injunction, (AC ¶¶ 210-32), constitutes a prayer for relief and not a separate claim. *See RJ Capital, S.A. v. Lexington Capital Funding III, Ltd.*, No. 10-CV-25, 2011 WL 3251554, at *16 (S.D.N.Y. July 28, 2011) ("Specific performance is an equitable remedy for a breach of contract, rather than a separate cause of action.") (alteration and internal quotation marks omitted); *Tierney v. Omnicom Grp. Inc.*, No. 06-CV-14302, 2007 WL 2012412, at *10 (S.D.N.Y. July 11, 2007) ("Specific performance is a remedy, and a remedy itself cannot be a cause of action."); *Pace v. Schwartz*, 680 F. Supp. 2d 591, 594 (S.D.N.Y. 2010) (noting that injunction is a remedy and not a separate cause of action but stating that fact that plaintiffs pleaded request for injunction as separate claim rather than as part of prayer for relief did not "disentitle[] them to seek injunctive relief"). Accordingly, Plaintiff's request for specific performance or an injunction is dismissed with prejudice with respect to Defendant's alleged obligation to pursue a rezoning, but is dismissed without prejudice to Plaintiff's ability to request the remedy of specific performance or an injunction at a future date in connection with its remaining claim, discussed below. *See Tierney*, 2007 WL 2012412, at *10.

b.   Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing for Failure to Pay the Consulting Fee

i.   Breach of Contract

Plaintiff alleges that through Defendant's TEAs and State court litigation, Defendant made a determination to proceed with the Development and therefore breached the Agreements by failing to provide Plaintiff with notice of this determination and pay the Consulting Fee, and instead seeking to compel Plaintiff to repurchase the Property. (*See* AC ¶¶ 179-209, 233-53.) By alleging that Defendant made several representations to the Town that it intended to proceed with the Development and took steps toward obtaining tax exemption and various approvals for the Property, Plaintiff has made a plausible showing that Defendant did in fact determine to proceed with the Development. Accordingly, Defendant's Motion to Dismiss fails as to this claim.

ii.   Breach of the Covenant of Good Faith and Fair Dealing

Plaintiff did not plead in the AC a claim for a breach of the covenant of good faith and fair dealing for failure to pay the Consulting Fee; instead, it raised this claim for the first time in its Memorandum of Law in support of its Motion, asserting that Defendant withheld notice of its determination to proceed in "bad faith" and with the intent to "deprive" Plaintiff of the Consulting Fee. On this basis alone dismissal would be proper. *See Cement & Concrete Workers Dist. Council Welfare Fund v. Angel Constr. Grp., LLC*, No. 08-CV-1672, 2010 WL 3463181, at *6 (E.D.N.Y. June 15, 2010).

But this claim fails for a separate reason. Like the good faith/fair dealing claim discussed above, this claim is duplicative of a breach of contract claim. Plaintiff argues that Defendant breached the Agreements by failing to pay Plaintiff the Consulting Fee after determining to

proceed with the Development, (AC ¶ 249), and that Defendant breached the covenant of good faith and fair dealing by withholding notice of its determination to proceed in order to avoid paying the Consulting Fee, (P's Mem. 23). In both claims, the underlying wrong is Defendant's failure to pay the Consulting Fee following its alleged determination to proceed. The fact that Plaintiff describes the good faith/fair dealing claim as one premised on Defendant's withholding of notice is of no moment. The only function of the notice provision in paragraph 4 of the CA is to establish Plaintiff's right to the Consulting Fee and a timeframe in which it must be paid. The notice itself is not otherwise significant – a fact supported by the parties' express agreement that Defendant could pay the Consulting Fee *without* providing notice, (*see* McNamara Aff. Ex. 1-2 ¶ 4 ("[A]t any time before the end of the 2-Year Period, in its sole discretion, Watchtower may pay the Compensation to Lorterdan before it is otherwise due."); *id.* ("If within the 2-Year Period Watchtower . . . fails to exercise its rights under the [RA], then Watchtower shall pay Lorterdan [the Consulting Fee]"), and by Plaintiff's own admission that the notice requirement was "ministerial," (P's Mem. 22). Put differently, it is clear that Plaintiff would never bring a lawsuit for Defendant's failure to provide it with notice of Defendant's determination to proceed, so long as Defendant acted on the consequence of that determination and paid Plaintiff the money due. Accordingly, this claim is dismissed as duplicative of Plaintiff's breach of contract claim.

    B.    <u>Motions for Summary Judgment</u>

        1.    <u>Legal Standards</u>

            a.    <u>Summary Judgment Standard</u>

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact, and, if satisfied, the burden then shifts to the non-movant to present evidence sufficient "to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

"The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). Where, as here, an affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see Major League Baseball*

*Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). In the event a party "fails to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3). Where there are cross-motions for summary judgment, "a court need not 'grant judgment as a matter of law for one side or the other,' but 'must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Pfizer*, 348 F. Supp. 2d at 140 (quoting *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)).

### b.   Contract Interpretation

"Under New York law, the interpretation of an unambiguous contract is a question of law for the court. When an agreement is ambiguous, however, its meaning is a question of fact." *Id.* at 142. "[I]f the contract is ambiguous and relevant extrinsic evidence as to its meaning is available, its interpretation is a question of fact for the factfinder." *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 111 (2d Cir. 2006); *see Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000) (whereas court decides meaning of unambiguous contract or meaning of ambiguous contract if there is no extrinsic evidence as to the contract's meaning, fact-finder decides meaning of ambiguous contract where there is extrinsic evidence). Whether a contract is unambiguous, therefore, "is a threshold question. The existence of an ambiguity depends on whether there is a reasonable basis for difference of opinion as to the meaning of the contract. A contractual provision is not ambiguous merely because the parties urge different interpretations of it." *Pfizer*, 348 F. Supp. 2d at 142.

When interpreting a contract, "words and phrases should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (alteration and internal quotation marks omitted); *see Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, Nat'l Ass'n*, No. 10-CV-1772, 2012 WL 1611830, at *3 (E.D.N.Y. May 9, 2012) ("[W]here the language of [a contract] is unambiguous on its face, it must be enforced according to the plain meaning of its terms" in order to give effect to the parties' intent.). "An interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible." *LaSalle*, 424 F.3d at 206 (alterations and internal quotation marks omitted).

### 2.   Plaintiff's Claim

#### a.   Breach of Contract for Failure to Pay the Consulting Fee

Plaintiff's remaining claim alleges that Defendant breached the Agreements by not paying Plaintiff the Consulting Fee after it had determined to proceed with the Development and instead seeking to compel Plaintiff to repurchase the Property. Plaintiff makes four arguments in support of this position: (1) Defendant "determined to proceed" with the Development on February 27, 2009, the date it submitted its First TEA, and affirmed this determination through the Second and Third TEAs and the CBA, (P's Mem. 7, 11); (2) Defendant waived its repurchase rights by having "determined to proceed" with the Development prior to November 1, 2010, (*id.* at 12-14); (3) by submitting the Third TEA, which represented that no change involving a proposed sale of the Property had taken place, Defendant admitted that it had not issued a notice of sale or repurchase and therefore waived its right to do so, or, in the alternative, failed to issue a lawful notice of sale to Plaintiff during the Two-Year Period, (*id.* at 14-17); and (4) Defendant

23

is judicially estopped from asserting that it had not yet "determined to proceed" with the Development because it stated in its First and Second TEAs and in the State court litigation concerning the First TEA that it had in fact determined to proceed, (*id.* at 17-21).

i.    <u>Breach of Contract Arguments One and Two – Determination to Proceed</u>

At the heart of this case is a disagreement over whether Defendant determined to proceed with the Development within the meaning of section 4 of the CA. The relevant language is as follows:

> 4. If within the 2-Year Period Watchtower (a) *determines that it will proceed with the Development,* or (b) fails to exercise its rights under the Repurchase Agreement, then Watchtower shall pay Lorterdan Nine Million Five Hundred Thousand Dollars . . . as a fee for Lorterdan's consulting services and other assistance in assisting Watchtower to obtain the Approvals . . . . Such payment shall be made within ten (10) days of Watchtower giving Lorterdan written notice that Watchtower intends to proceed with the Development.

(McNamara Aff. Ex. 1-2 ¶ 4 (emphasis added).) The Court must consider what it means to "determine to proceed," an issue not addressed in the CA. There are several possible interpretations of that phrase. First, one could read the Agreements as requiring Defendant to provide Plaintiff with formal notice of a determination to proceed before the obligation to pay the Consulting Fee is triggered. Notably, neither party argues that this interpretation is correct, and I see why. The conditional language in the CA makes it clear that the payment obligation is triggered upon a determination to proceed, or upon a failure of Defendant to exercise its rights under the RA (McNamara Aff. Ex. 1-2 ¶ 4 ("*If* . . . Watchtower (a) determines that it will proceed with the Development, or (b) fails to exercise its rights under the [RA], *then* Watchtower shall pay Lorterdan" the Consulting Fee.) (emphasis added)), and not upon Defendant's provision of notice of the determination. Moreover, paragraph 6 of the CA explicitly states that

written notice is required for any determination *not* to proceed to take effect. (*Id.* ¶ 6 ("If for any

reason before the end of the 2-Year Period Watchtower determines that it will not proceed with

the Development *and* gives written notice of that determination to Lorterdan," then the CA will

terminate.) (emphasis added).)  The conspicuous absence of similar language in paragraph 4

indicating that written notice is required to effectuate a determination *to* proceed reinforces the

plain reading of the CA that no such notice is required to trigger a payment of the Consulting

Fee.

   A second possibility seems to be proposed by Defendant:  that Defendant determines to

proceed only if it does not within the Two-Year Period give notice that it is not proceeding.  In

this scenario, regardless of what Defendant may have decided internally, it always retained the

right under paragraph 6 of the CA to decide not to go forward, even if that represented a change

of heart.[18]  I cannot say as a matter of law that that is the correct interpretation, because if it

were, paragraph 4(a) – requiring payment of the $9.5 million upon a determination to proceed –

would be superfluous, given that paragraph 4(b) already provides that the payment must be made

if Defendant does nothing within the Two-Year Period.  *See LaSalle*, 424 F.3d at 206 ("An

interpretation of a contract that has the effect of rendering at least one clause superfluous or

meaningless is not preferred and will be avoided if possible.") (alterations and internal quotation

marks omitted).

   Third, at the other extreme, one could read paragraph 4 of the CA to mean that any step

taken by Defendant in furtherance of the Development may be construed as a determination to

---

[18] Defendant does not argue that the Agreements permitted Defendant to determine to proceed within the meaning of paragraph 4 of the CA and then reverse that determination pursuant to paragraph 6 of the CA. The Court construes Defendant's statement that an "internal" determination could be reversed as implying that an "internal" determination is not in fact a "determination" within the meaning of the CA.

25

proceed. This interpretation also seems implausible, as the CA's stated purpose is to provide Defendant with assistance in obtaining various approvals and permits for the Development. (McNamara Aff. Ex. 1-2, at 1.) If working with Plaintiff to obtain approvals and permits meant that Defendant had determined to proceed, then paragraph 4 of the CA would be vitiated by, or at least in tension with, the rest of the agreement. *See LaSalle*, 424 F.3d at 206. Indeed, if taking any steps to develop the Property amounted to a determination to proceed, as Plaintiff seems to argue, the provision allowing Defendant to give notice that it was *not* proceeding would have been totally superfluous from the beginning, as Defendant took some of those steps even before the closing.[19] In other words, determining to proceed within the meaning of the CA must be something more than the "intended development of the Property" in paragraph 2 of the RA.

Accordingly, I cannot on this record say as a matter of law what was intended by the phrase "determines that it will proceed." One possibility, between the two extremes urged by the parties, is that Defendant had to have reached a sufficiently concrete decision to commit to the intended Development before it could be said to have determined to proceed, but that decision did not have to rise to the level of formal written notice. In other words, a determination to proceed could be more than Defendant taking some steps in furtherance of the intended Development and less than Defendant either giving formal notice that it was proceeding or getting to the end of the Two-Year Period without having given notice that it was not

---

[19] At trial, Plaintiff appears to face an uphill battle in arguing that the submission of Defendant's First TEA on or around the closing date constituted a determination to proceed. The evidence submitted by the parties indicates that Defendant specifically bargained for a grace period during which it could change its mind about purchasing the Property. (*See, e.g.*, Rice Aff. ¶¶ 9-13; Moake Aff. Ex. C.) Yet under Plaintiff's theory, Defendant waived that right before the closing even occurred by filing the First TEA – a theory that seems highly unlikely given the evidence, but nonetheless one that I think, at least at this stage, ought to be the subject of discovery and perhaps assessment by a fact-finder. *See Revson*, 221 F.3d at 66. In addition, Plaintiff's conduct both before and after the closing, and even after receipt of the letter requiring repurchase, is totally inconsistent with an understanding of the Agreements that equated any steps toward development with a "determination to proceed."

proceeding. If the Court on a motion after discovery or the fact-finder at trial found that to be the proper interpretation, it would then have to determine whether Defendant's actions rose to the required level.

In sum, Plaintiff asserts that Defendant's TEAs, its State court litigation, and the CBA individually and collectively constitute a determination to proceed. In contrast, Defendant asserts that it took no action that would rise to the level of a determination to proceed, and that even if it had made an "internal" determination to proceed, (D's Mem. 15 n.4, 23 n.6), that determination did not rise to the level of a final determination that would trigger the Consulting Fee. Therefore, issues remain even after the meaning of "determines [to] proceed" is established: (1) what actions rise to the level of a determination to proceed within the meaning of the Agreements, and (2) did Defendant take such actions and in fact determine to proceed such that it triggered the obligation to pay Plaintiff the Consulting Fee? Both are questions appropriate for discovery and perhaps consideration by a fact-finder. Accordingly, Plaintiff's arguments that Defendant determined to proceed by submitting the TEAs and entering into the CBA (and thus also waived its repurchase rights) involve questions of material fact and are not ripe for disposition at this stage.

        ii.      <u>Breach of Contract Argument Three – Misrepresentation in the Third TEA regarding the Notice of Sale</u>

Plaintiff next asserts that by submitting the Third TEA, which represented that no change involving a proposed sale of the Property had taken place, Defendant admitted that it had not issued a notice of sale or repurchase, and therefore waived its right to do so, or, in the alternative, failed to issue a lawful notice of sale to Plaintiff during the Two-Year Period. (P's Mem. 14-17.) Plaintiff's argument misses the point. Even if Defendant misrepresented in its Third TEA that it

had not issued a notice of sale, this misrepresentation to the Town – even if deceitful – did not

impact Defendant's rights under the Agreements, undo the fact that it had sent the November 1,

2010 repurchase request, or trigger an obligation to pay the Consulting Fee. The Agreements are

clear as to when a waiver of Defendant's repurchase rights could occur – namely, upon failure to

give Plaintiff notice of its determination not to proceed within the Two-Year Period. (*See*

McNamara Aff. Ex. 1-3 ¶ 2.10.) Defendant concededly gave Plaintiff timely written notice as to

its desire for Plaintiff to repurchase the Property. Even if Defendant later attempted to deceive

the Town to obtain a tax exemption – which I do not find[20] – such conduct would not

retroactively invalidate a properly issued request for repurchase. Defendant's actions with

regard to third parties do not effect a waiver of its repurchase rights under the Agreements as a

matter of law (although Plaintiff could argue that those actions are evidence that Defendant had

determined to proceed).

iii.     <u>Breach of Contract Argument Four – Judicial Estoppel</u>

Plaintiff next argues that Defendant is judicially estopped from asserting that it did not

determine to proceed with the Development because it represented as much in its First and

Second TEAs and in its State court litigation. (P's Mem. 18-20.) The doctrine of judicial

estoppel precludes a party from asserting a factual position in one legal proceeding that is in

direct conflict with a position that is successfully advanced in a different proceeding. *Rodal v.*

*Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004). "[A] party invoking

judicial estoppel must show that (1) the party against whom the estoppel is asserted took an

inconsistent position in a prior proceeding and (2) that position was adopted by the first tribunal

---

[20] Defendant made clear to the Town (consistent with the position it had taken with Plaintiff) that it had "suspended its plans to develop the property." (Jackson Aff. Ex. 27, at 2.)

28

in some manner, such as by rendering a favorable judgment." *Id.* (internal quotation marks omitted).

Defendant's State court litigation challenging the denial of its First TEA cannot serve as grounds for invoking the doctrine of judicial estoppel because Defendant's position was never adopted by the Supreme Court of New York; rather, the case settled, and the Judge granted tax exempt status for the Property based on the settlement. (*See* Jackson Aff. Ex. 23); *see Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1038 (2d Cir. 1993) ("A settlement neither requires nor implies any judicial endorsement of either party's claims or theories, and thus a settlement does not provide the prior success necessary for judicial estoppel.") (internal quotation marks omitted); *United States v. W. Prods., Ltd.*, 168 F. Supp. 2d 84, 89 (S.D.N.Y. 2001) (same).

Nor can Defendant's Second TEA serve as grounds for invoking judicial estoppel. Even if the TEAs were considered administrative or quasi-judicial proceedings, *see, e.g., Am. Mfrs. Mut. Ins. Co. v. Payton Lane Nursing Home, Inc.*, 704 F. Supp. 2d 177, 193 (E.D.N.Y. 2010) (judicial estoppel applies "where the prior statements were made to administrative agencies, *i.e.*, in administrative or quasi-judicial proceedings" and bars party from adopting factual position in court that is contrary to position taken on tax return), judicial estoppel is inappropriate because Defendant's position here does not present an "irreconcilable direct conflict" with its position in the TEAs, *Rodal*, 369 F.3d at 119. Defendant's Second TEA incorporated the First TEA by stating that there had been "no change" since the First TEA was submitted. (Jackson Aff. Ex. 25.) Defendant's First TEA listed the "intended" and "proposed" uses of the property, indicated the financing sources for the "contemplated" buildings, and stated that construction would commence "[a]s soon as necessary Town and other approvals for the development are obtained." (*Id.* Ex. 5 ¶¶ 10, 14.)

Yet these statements are not necessarily inconsistent with Defendant's position in this litigation that it never "determined to proceed" with the Development within the meaning of the Agreements. Even if the statements in the First TEA imply that Defendant had concrete plans to develop the Property – notwithstanding the use of the terms "intended" and "contemplated" – the Agreements specifically provided Defendant with a two-year window during which it could back out of its purchase "for any reason." (McNamara Aff. Ex. 1-3 ¶ 2.) It is entirely possible, therefore, that Defendant had concrete plans to develop the Property (as stated in the TEAs) but ultimately decided to exercise its repurchase rights because, for example, it found the permitting and approvals processes – processes which the Agreements specifically contemplated Defendant would undertake, (*see id.* ¶ 2.9) – too difficult or burdensome. Therefore, Defendant's statements in the TEAs are not necessarily in direct conflict with its position in this litigation. The meaning of the phrase "determines that it will proceed" remains an open question, and thus so too is the question of whether Defendant's representations in the TEAs constituted a determination to proceed.[21]  These questions of fact are not appropriately resolved at the summary judgment stage, at least on this record. *See Rodal*, 369 F.3d at 119-20 (because statements at issue did not present "irreconcilable direct conflict," summary judgment was inappropriate).

### 3. Defendant's Counterclaims

Defendant asserts two primary counterclaims against Plaintiff:  (1) Plaintiff breached the Agreements by failing to repurchase the Property pursuant to the RA, (Answer ¶¶ 16-20), and (2)

---

[21] For example, if the fact-finder decided that a determination to proceed meant a commitment to build that was subjectively regarded by Defendant as irrevocable, it could conclude that the statements in the TEAs were not inconsistent with Defendant's steps toward development because Defendant had not yet made a decision that it regarded as final.

Plaintiff fraudulently induced Defendant to enter the Agreements while having no intention of

ever repurchasing the Property, (*id.* ¶¶ 21-32). Defendant also asserts claims for a declaratory

judgment and specific performance. (*Id.* ¶¶ 1-15, 33-38.)

a.    <u>Breach of Contract</u>

Whether Plaintiff breached the Agreements by failing to repurchase the Property turns on

whether Plaintiff had an obligation to repurchase the Property. That, in turn, depends on whether

Defendant had already determined to proceed with the Development within the meaning of the

CA, which, as discussed above, is a question of fact not appropriately resolved at the summary

judgment stage. Accordingly, this counterclaim will not be dismissed.

b.    <u>Fraudulent Inducement</u>

In its Answer, Defendant asserts that Plaintiff induced Defendant to enter into the

Agreements by falsely promising that it would repurchase the Property in the event Defendant

determined not to proceed with the Development, while having no intention of ever repurchasing

the Property pursuant to the RA. (Answer ¶¶ 23-28.)

To state a claim of fraudulent inducement, a plaintiff must demonstrate: "(1) a

representation of material fact, (2) which was untrue, (3) which was known to be untrue or made

with reckless disregard for the truth, (4) which was offered to deceive another or induce him to

act, and (5) which that other party relied on to its injury." *Aetna Cas. & Sur. Co. v. Aniero

Concrete Co.*, 404 F.3d 566, 580 (2d Cir. 2005).

Whether construed as a motion to dismiss or as a motion for summary judgment,

Plaintiff's Motion is well-taken. Defendant has not supported its claim of fraud with any facts or

even allegations. Indeed, Defendant does not even mention this claim in its Memorandum of

Law, except for one sentence in its conclusion asking the Court to find in its favor, and its

31

averments regarding this claim in its Answer and Counterclaims, (Doc. 3), are purely

conclusory.[22]  Thus, because Defendant has presented no evidence establishing Plaintiff's intent

or the falsity of Plaintiff's statements, or any allegations making the same plausible, this claim is

dismissed.

Defendant's fraud in the inducement claim fails for a separate reason as well:  it merges

with Defendant's breach of contract claim.  "Where a fraud claim 'is premised upon an alleged

breach of contractual duties, and the supporting allegations do not concern representations which

are collateral or extraneous to the terms of the parties' agreement, a cause of action sounding in

fraud does not lie.'"  *Cont'l Petroleum Corp. v. Corp. Funding Partners, LLC*, No. 11-CV-7801,

2012 WL 1231775, at \*10 (S.D.N.Y. Apr. 12, 2012) (alteration omitted) (quoting *McKernin v.*

*Fanny Farmer Candy Shops, Inc.*, 574 N.Y.S.2d 58, 59 (2d Dep't 1991)).  As such, to make out

a claim for fraudulent inducement that is sufficiently distinct from a breach of contract claim, "a

plaintiff must '(i) demonstrate a legal duty separate from the duty to perform under the contract;

or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii)

seek special damages that are caused by the misrepresentation and unrecoverable as contract

damages.'"  *Id.* (quoting *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13,

20 (2d Cir. 1996)).

Here, Defendant fails to establish any of the above three requirements.  Rather,

Defendant asserts only that Plaintiff "falsely and fraudulently promised to repurchase the

Property without the intent ever to do so and with the intent to induce Watchtower to enter into

[the] Agreements." (Answer ¶ 27.)  This allegation is insufficient to demonstrate the existence

---

[22] Defendant sufficiently alleges that Plaintiff did not buy back the Property, and it describes why the Two-Year Period was agreed upon, but it provides no facts from which it may plausibly be inferred that Plaintiff, at the time of the agreement, intended to dishonor that obligation.

of a legal duty separate from Plaintiff's repurchase obligation under the RA or a misrepresentation collateral or extraneous to the Agreements. Nor has Defendant sought special damages that are unrecoverable as contract damages. Rather, Defendant "'[s]imply dress[ed] up [its] breach of contract claim by further alleging that the promisor had no intention, at the time of the contract's making, to perform its obligations thereunder, [which] is insufficient to state an independent . . . claim'" for fraudulent inducement. *Cont'l Petroleum*, 2012 WL 1231775, at *10 (quoting *Telecom Int'l Am., Ltd. v. AT & T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001)). Accordingly, this claim is dismissed.

### c.    Declaratory Judgment and Specific Performance

Defendant asserts counterclaims for a declaratory judgment and specific performance. (*See* Answer 4, 10.) Defendant's claim for a declaratory judgment is dismissed as duplicative of its breach of contract claim because, while a declaratory judgment "may clarify or settle the parties' legal relations" as to the Agreements, any "'cloud of uncertainty'" regarding the Agreements "will be dispelled in litigation of the breach of contract claim." *Intellectual Capital Partner v. Institutional Credit Partners LLC*, No. 08-CV-10580, 2009 WL 1974392, at *6 (S.D.N.Y. July 8, 2009) (internal quotation marks omitted). Thus, because "there is a better or more effective remedy than a declaratory judgment action – specifically, the underlying litigation itself" – this claim is dismissed. *Amusement Inds., Inc. v. Stern*, 693 F. Supp. 2d 301, 312 (S.D.N.Y. 2010) (internal quotation marks omitted). Finally, for the reasons discussed in the context of Plaintiff's request for specific performance, Defendant's request for specific performance is dismissed without prejudice to pursuing it at a later time.

C.    Leave to Amend

Prior to making the pending Motions, the parties submitted pre-motion letters to this Court. Neither party requested leave to amend the AC. (*See* Docs. 7-8, 10.) Nor did they request an opportunity to amend at the pre-motion conference before the Court on July 11, 2011, or in their motion papers.[23]   Accordingly, I decline to grant leave to amend *sua sponte*. In any event, it does not appear that amendment would cure any of the obstacles to summary judgment or revive any of the dismissed claims. *See Ariel (UK) Ltd. v. Reuters Grp., PLC*, 277 F. App'x 43, 45-46 (2d Cir. 2008) (summary order) (district court did not exceed its discretion in not *sua sponte* granting leave to amend where Plaintiff had already amended complaint once and amendment would have been futile); *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (Where the "problem with [a complaint] is substantive[ and] better pleading will not cure it," leave to amend should be denied as futile.); *cf. Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) ("no court can be said to have erred in failing to grant a request [to amend the complaint] that was not made").

---

[23] The AC states the following:

> [S]hould it be discovered that Defendant has at all times . . . acted intentionally and with malice aforethought to . . . cheat Plaintiff out of the full agreed $21 million purchase price . . . then, in such event, Plaintiff asks that leave be granted to further amend the Complaint or, in the alternative, at trial, to conform the pleadings to the proof . . . .

(AC ¶ 23.) Plaintiff's request for an amendment has not materialized because discovery has not yet taken place.

## III.  **Conclusion**

For the foregoing reasons, Defendant's Motion for Judgment on the Pleadings is GRANTED as to Plaintiff's breach of contract claim for failure to pursue a rezoning of the Property, breach of the covenant of good faith and fair dealing claims, and declaratory judgment claim. It is GRANTED without prejudice as to Plaintiff's request for specific performance in connection with Plaintiff's remaining claim. It is DENIED as to Plaintiff's breach of contract claim for failure to pay the Consulting Fee. Defendant's Cross-Motion for Summary Judgment is DENIED as to Plaintiff's breach of contract claim for failure to pay the Consulting Fee. Plaintiff's Motion for Summary Judgment is DENIED as to Defendant's breach of contract counterclaim. It is GRANTED as to Defendant's fraudulent inducement and declaratory judgment counterclaims and GRANTED without prejudice as to Defendant's request for specific performance in connection with Defendant's remaining counterclaim. The Clerk of Court is respectfully requested to terminate the pending motions, (Docs. 15, 20). The parties are to appear for a conference before this Court on July 30, 2012 at 10:30 a.m.

**SO ORDERED.**

Dated: July 9, 2012
White Plains, New York

CATHY SEIBEL, U.S.D.J.

35